UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RALPH KAUS,

                             Plaintiff,

         v.

CARRIAGE HOUSE COMPANIES, INC.,

                             Defendant.

_____

**REPORT**
**and**
**RECOMMENDATION**

**03-CV-435A(F)**

APPEARANCES:         CHIACCHIA & FLEMING, LLP
                            Attorneys for Plaintiff
                            ANDREW P. FLEMING, of Counsel
                            5113 South Park Avenue
                            Hamburg, New York 14075

                            HARTER, SECREST & EMERY LLP
                            Attorneys for Defendant
                            ROBERT C. WEISSFLACH, of Counsel
                            Twelve Fountain Plaza
                            Suite 400
                            Buffalo, New York 14202-2293

## JURISDICTION

       This case was referred to the undersigned by Honorable Richard J. Arcara for all

pretrial proceedings on August 13, 2003.  The matter is presently before the court on

Defendant's motion for summary judgment and costs, including attorney's fees (Doc.

No. 12), filed July 30, 2004.

## BACKGROUND

_____Plaintiff, Ralph Kaus, commenced this action on June 5, 2003, alleging

employment discrimination, based on his race and disability, against his former

employer Defendant, Carriage House Companies, Inc., in violation of Title I of the
Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. ("the ADA"), Title VII
of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and New York
Human Rights Law, N.Y. Exec. Law § 290 *et seq*. (McKinney 2005)[1] ("New York's HRL"
or "HRL")  Plaintiff, who is Caucasian and suffers from degenerative arthritis and
tendinitis in his lower extremities, and pes valgus (flat feet), asserts nine causes of
action, including that Defendant (1) failed to accommodate Plaintiff's disability in
violation of the ADA (First Cause of Action); (2) discriminated and harassed Plaintiff
based on his disability in violation of the ADA (Second Cause of Action); (3) failed to
reasonably accommodate Plaintiff's disability in violation of New York's HRL (Third
Cause of Action); (4) regarded Plaintiff as disabled in violation of the ADA (Fourth
Cause of Action); (5) retaliated against Plaintiff for requesting a reasonable
accommodation of his disability in violation of the ADA (Fifth Cause of Action); (6)
retaliated against Plaintiff in violation of New York's HRL (Sixth Cause of Action); (7)
regarded Plaintiff as disabled in violation of New York's HRL (Seventh Cause of Action);
(8) discriminated against Plaintiff based on his race in violation of New York's HRL
(Eighth Cause of Action); and (9) discriminated against Plaintiff based on his race in
violation of Title VII (Ninth Cause of Action).  Defendant filed its answer on August 11,
2003.

On July 30, 2004, as noted, Defendant filed a motion for summary judgment
seeking to dismiss the Complaint in its entirety and, pursuant to 42 U.S.C. § 2000e-5(k)

---

[1] Unless otherwise specified, references to N.Y. Exec. Law are to McKinney's Vol. 18
Consolidated Laws of N.Y. (2005) (hereinafter "McKinney 2005").

(Title VII) and § 12205 (ADA), an award of costs of the motion including attorney's fees.

The motion is supported by the Affidavit of Gary M. Sobilo dated July 30, 2004 (Doc.

No. 13) ("Sobilo Affidavit"), the Declaration of Robert C. Weissflach, Esq., dated July

30, 2004 (Doc. No. 14) ("Weissflach Declaration"), Defendant's Local Rule 56.1

Statement of Undisputed Material Facts (Doc. No. 15) ("Defendant's Fact Statement"),

three volumes of exhibits (Doc. Nos. 16, 17 and 18) ("Defendant's Exhs. __"), and

Defendant's Memorandum of Law in Support of Motion for Summary Judgment (Doc.

No. 19) ("Defendant's Memorandum").  On September 17, 2004, Plaintiff filed a

response in opposition to summary judgment (Doc. No. 22), consisting of the Affidavit

of Ralph Kaus in Opposition to Motion for Summary Judgment dated September 17,

2004 ("Plaintiff's Affidavit"), and exhibits ("Plaintiff's Exhs. __").  On September 20,

2004, Plaintiff filed a Memorandum in Opposition to Summary Judgment (Doc. No. 23)

("Plaintiff's Memorandum"), attached to which is Plaintiff's Local Rule 56.1 Statement of

Undisputed Material Facts and Disputed Material Facts Requiring a Trial ("Plaintiff's

Fact Statement").[2]

On October 1, 2004, Defendant filed in further support of summary judgment the

Reply Declaration of Robert C. Weissflach, Esq., dated October 1, 2004 (Doc. No. 24)

("Weissflach Reply Declaration"), the Reply Declaration of Gary M. Sobilo, dated

October 1, 2004 (Doc. No. 27) ("Sobilo Reply Declaration"), and the Reply

Memorandum of Law in Support of Motion for Summary Judgment (Doc. No. 28)

---

[2] Plaintiff's Fact Statement and Plaintiff's Memorandum originally were filed, respectively, as Attachments 1 and 10 to Plaintiff's Response, but because the documents did not comply with the court's electronic filing signature requirements, corrected versions of the documents were filed on September 20, 2004.

("Defendant's Reply Memorandum").  On October 6, 2004, Defendant filed the

Affidavits of Suzie Thornton, dated September 30, 2004 (Doc. No. 30) ("Thornton

Affidavit'), and Willie Clyde, dated September 30, 2004 (Doc. No. 31) ("Clyde

Affidavit").[3]  On October 8, 2004, Plaintiff filed the Sur-Reply Affidavit of Andrew P.

Fleming, Esq., in Opposition to Motion for Summary Judgment, dated October 6, 2004

(Doc. No. 33) ("Fleming Sur-Reply Affidavit").  On October 20, 2004, Defendant filed the

Sur-Response Declaration of Robert C. Weissflach, Esq., dated October 20, 2004 (Doc.

No. 34) ("Weissflach Sur-Response Declaration").  Oral argument was deemed

unnecessary.

 Based on the following, Defendant's motion for summary judgment and attorney

costs should be GRANTED.


# <u>FACTS</u>[4]

Defendant Carriage House Companies, Inc. ("Carriage House"), is a subsidiary

of Ralcorp Holdings, Inc. and the corporate successor to The Red Wing Company, Inc.

("Red Wing"), Plaintiff's original employer.[5]  Defendant is engaged in the manufacture of

a variety of "wet-filled" products, which includes sauces, jams, jellies and syrups, and

---

[3] The Thornton Affidavit and the Clyde Affidavit originally were filed on October 1, 2004, as Doc. Nos. 26 and 25, respectively, but because the documents did not comply with the court's signature requirements, corrected versions of the documents were filed on October 6, 2004.

[4] Taken from the pleadings and motion papers filed in this action.

[5] As the record does not indicate when Carriage House became the corporate successor to Red Wing, the court does not differentiate as to which of the alleged discriminatory actions occurred while Kaus was employed by Carriage House, and which occurred while Kaus was employed by Red Wing, and, unless otherwise stated, refers hereinafter to Kaus's employer as "Defendant."

owns and operates a facility in Fredonia, New York.  Defendant's Fact Statement ¶ 2.

Defendant maintains both an Equal Employment Opportunity policy ("EEO policy") and

an anti-harassment policy  ("Anti-Harassment Policy") (together, "the Nondiscrimination

Policies") and also provides an internal procedure for handling employees'

discrimination and harassment concerns.  Both of the Nondiscrimination Policies

prohibit retaliation of any kind against any employee who makes a complaint pursuant

to the policies.  Employees are provided with copies of the Nondiscrimination Policies

during orientation and copies of the Nondiscrimination Policies are posted on bulletin

boards throughout the workplace.  As relevant,  Defendant's work rules are included in

the company's Employee Handbook, copies of which are provided to all employees and

posted on bulletin boards throughout the Fredonia workplace, identify what conduct

constitutes "just cause" warranting immediate discharge or disciplinary action.[6]

Plaintiff Ralph Kaus ("Kaus"), then 46 years old, initially commenced employment

with Red Wing  as a Maintenance C employee on March 22, 1999.[7]  As an employee of

Defendant, Kaus was a member of the National Conference of Firemen and Oilers

SEIU Local No. 266 ("the Union"), with is a party to a collective bargaining agreement

("the CBA") with Defendant.[8]  The CBA contains a nondiscrimination clause and a

---

[6] The record implies that the Nondiscrimination Policies were originally established by Red Wing, and continued in effect under Carriage House, however, such fact is neither asserted by Defendant, nor challenged by Plaintiff.

[7] Although Kaus's date of birth is not in the record, Kaus stated in an affidavit made in support of his EEOC charge, dated January 3, 2003, that he is 51 years old.  EEOC Charge Affidavit, Defendant's Exh. A ¶ 1.  Thus, as of March 22, 1999, Kaus would have been either 46 or 47 years old, depending on date of birth.

[8] The CBA was initially negotiated with Red Wing, and adopted by Carriage House as Red Wing's successor.

grievance procedure through which Union employees may raise complaints.

During the new employee orientation process, Kaus received copies of Red Wing's Nondiscrimination Policies, the CBA and the Employee Handbook.  In connection with the hiring process, Kaus completed a "Post-Offer – Pre-Employment Job Placement Medical Questionnaire" ("First Medical Questionnaire"),[9] checking boxes indicating a history of several physical conditions including hay fever, hernia, and knee pain or surgery.  Kaus, however, did not complete the portion of the form requesting an explanation of such conditions.  First Medical Questionnaire.  In response to the question whether Kaus had ever received worker's compensation payments or any similar type of compensation for an accident, illness or injury, Kaus wrote that he had received New York State disability benefits for a "knee injury outside of work place."  *Id*.

On September 15, 1999, following  a 180-day probationary period, Red Wing discharged Kaus who had failed to pass three of the skills tests required for regular employment as a Maintenance C employee.[10]  At the time of Kaus's discharge, Defendant's Human Resources Manager, Gary M. Sobilo ("Sobilo"), advised Kaus that he could re-apply for employment with Defendant and would be considered for any other position for which Kaus was qualified.

Subsequent to his discharge, Kaus applied for re-employment with Red Wing and was hired to commence work on August 7, 2000 as a third shift (10:00 P.M. through 6:30 A.M.) company sanitation worker, the primary duties of which included cleaning and

---

[9] Defendant's Exh. D.

[10] The record does not indicate what the skills tests entailed.

6

sanitizing manufacturing equipment and the surrounding work areas in the assigned department.  In connection with his new employment, Kaus completed another "Post-Offer – Pre-Employment Job Placement Medical Questionnaire ("Second Medical Questionnaire")[11], checking boxes indicating a history of several physical conditions, similar to those Kaus had previously noted on his First Medical Questionnaire, including hernia, elbow pain or surgery and knee pain or surgery.  In the portion of the questionnaire requesting an explanation of such conditions, Kaus, in contrast to his failure to describe such condition in the First Medical Questionnaire,  wrote that in 1978 he underwent surgical correction of a hernia which presented "no problems."  Second Medical Questionnaire.  Kaus also stated that in November 1999 he injured his left elbow during a home remodeling project, resulting in swelling and a broken vein, but that the condition presented "no problem."  *Id*.  Kaus further wrote, without any indication of the of the applicable date, that he had surgery on the inside ligaments of his right knee.  *Id*.  In response to the question whether he had ever received worker's compensation payments or any similar type of compensation for an accident, illness or injury, Kaus, as he had in the First Medical Questionnaire, wrote that he had received New York State disability benefits for a "knee injury (off the job)."  *Id*.

On September 1, 2000, Kaus, while cleaning the floor underneath the tomato cook deck in the Defendant's Tomato Department, twisted his right knee sustaining an injury for which Kaus did not immediately seek medical attention.  However, a "Dr.

---

[11] Defendant's Exh. N.

Kim"[12] eventually placed Kaus on medical restrictions, including no bending or repetitive

climbing, from October 31, 2000 until at least November 29, 2000 when Kaus was to be

examined by Kevin M. Ouweleen, M.D. ("Dr. Ouweleen"), with the Lakeshore

Orthopedic Group, P.C.  Defendant's Exh. O. On November 29, 2000, Dr. Ouweleen

examined Kaus and continued the restrictions Dr. Kim had established for Kaus.

Defendant's Exhibit O.  Dr. Ouweleen also noted Kaus had a varus (knee) deformity in

the right knee which was tender.  Plaintiff's Exh. A. X-rays taken of Kaus's right knee

showed "significant medial compartment arthritis," "some proximal tib./fib. arthritis and

some mild patellofemoral arthritis."  Plaintiff's Exh. A.  Dr. Ouweleen's impression was

that Kaus's knee condition was "[w]ork related exacerbation of right knee degenerative

arthritis."  *Id*.  In response, to accommodate Kaus's medical restrictions, Defendant

moved Kaus to a temporary light duty position inspecting labels in the Tomato

Department until December 7, 2000, when Dr. Ouweleen permitted Kaus to return to

his position in the Sanitation Department.

On February 7, 2001, Kaus successfully completed his 180-day probationary

period as a sanitation worker and was transferred to a Sanitation B position in the Jam

and Jelly Department.   Kaus also then became eligible to bid for any posted vacant

positions within Defendant's manufacturing facility.  Pursuant to the CBA, vacant

positions are required to be posted for at least five days to permit permanent

employees to bid on such positions.  A posted position is awarded to the candidate who

---

[12] The record does not indicate what type of physician or other medical professional "Dr. Kim" is, or whether Dr. Kim is an orthopedic or any other type of medical specialist.

possesses the required qualifications.  If two or more qualified candidates bid for the same posted vacant position, the position is awarded, in accordance with CBA requirements, to the qualified candidate with the most seniority with the company.

According to Kaus, despite Dr. Ouweleen's clearance, and Kaus's job change, his right knee continued throughout the year to bother him as Kaus's position in the Jam and Jelly Department required frequent bending and twisting such that by February 2002, Kaus had "tremendous pain" in his feet and, by the end of March 2002, Kaus "could barely walk."  Plaintiff's Affidavit ¶ 14.  Nevertheless, Kaus continued to work in the Sanitation B position without requesting any accommodation for his physical disabilities until April 2002 when Kaus maintains he asked his supervisor, Glen Wysocki ("Wysocki"), to move him to another position that would put less strain on Kaus's knees and feet.  Kaus further maintains that he looked at the posted vacant positions for open positions for which the physical requirements would put less strain on his feet and knees, but no such positions were posted although several jobs Kaus believed would have been suitable for him, given his physical limitations, were regularly filled by employees provided through a temporary employment agency.

From April 12, 2002 through April 25, 2002, Kaus took a leave of absence under the Family Medical Leave Act ("FMLA"), to seek treatment for pain in his knees and ankles.  In particular, on April 12, 2002, Kaus, upon referral from his primary physician, was examined by Dr. Robert A. Zimmer ("Dr. Zimmer"), an orthopedic specialist, who found Kaus presented with symptoms consistent with posterior tibial tendinitis on the left side and "long standing severe pes valgus deformity."  Plaintiff's Exh. B.  Dr. Zimmer advised Kaus "may require long term supportive type devices in his shoes."  *Id*.

Upon reexamining Kaus on April 19, 2002, Dr. Zimmer reiterated that Kaus should obtain supportive footwear to prevent his foot and knee pain from becoming a "progressive & chronic complaint," and that Kaus may need molded orthotic devices in his shoes.  As a Sanitation Department employee, Kaus was required to wear chemical resistant work boots, and Kaus complied with that requirement.  Upon returning to work on April 25, 2002, Kaus advised Wysocki that he needed orthopedic molded work boots.  Wysocki instructed Kaus to order new chemical resistant work boots through the company catalog and advised that Kaus would be required to pay the $60 cost of the new work boots.

Kaus consulted the company catalog for chemical resistant work boots, but as the catalog did not contain chemical resistant work boots that included the orthopedic molds recommended by Dr. Zimmer, Kaus's new work boots, which he ordered from the catalog, did not alleviate the pain and Kaus again requested Wysocki assist Kaus in obtaining orthopedic molded chemical resistant work boots.  Wysocki again advised Kaus that Kaus was responsible for obtaining the boots, that the boots must be purchased through the company catalog and must be chemical resistant footwear as Kaus worked in the Sanitation Department.  Because the only chemical resistant orthopedic molded work boots Kaus could find cost more than $ 700, which Defendant refused to pay, Kaus maintains that between March and June 2002, he made several requests to Wysocki to transfer from the Sanitation Department, the only department within the company where employees were required to wear chemical resistant footwear, to a position in another department where Defendant could wear less expensive non-chemical resistant orthopedic molded shoes, but his requests were

10

denied.  According to Kaus, during the period March through July 2002, Wysocki

referred to Kaus as a "trouble-maker" and a "big stone in his [Wysocki's] ass."  Plaintiff's

Affidavit ¶ 27.

Kaus made a final request for a transfer on July 28 or 29, 2002, to which

Wysocki responded that Kaus would be placed in Trash Detail within the Sanitation

Department, a position for which no vacancy had been posted, and that Wysocki would

move another employee from that position to create an opening for Kaus.  Plaintiff's

Affidavit ¶¶ 28-29.  As the Trash Detail position required a forklift license, which Kaus

did not possess, Wysocki directed one Karen Edwards to schedule Kaus for a forklift

test, but the test was never scheduled.  Furthermore, Kaus had concerns as to his

qualifications for the Trash Detail position, including that the manual handling of

oversized and heavy barrels weighing in excess of 300 pounds would aggravate his

knee and foot impairments.  Nevertheless, Kaus maintains that because he was never

scheduled for the forklift test, he was never qualified for the position.  *Id*. ¶ 32.

Defendant, in contrast, maintains that in July 2002, Sobilo offered Kaus the janitor

position in the Sanitation Department, but that Kaus declined the position because

Kaus was not qualified to operate a forklift and Kaus never followed through with the

scheduling of a forklift operation test.  Sobilo Affidavit ¶ 30.  The parties do not dispute

that Kaus never formally bid for any posted vacant position within Defendant's Fredonia

plant.

On August 8, 2002, Kaus, while in the Sanitation Department office completing

routine paperwork, made a racially offensive joke.  Other employees present in the

Sanitation Department office at that time included Ross Winkleman ("Winkleman"),

11

Michael Vecchio ("Vecchio"), Suzie Thornton ("Thornton"), Willie Clyde ("Clyde"), Sandra Chesbro ("Chesbro"), Crystal Barrett ("Barrett") and Kris Roush ("Roush").  All the co-workers present, as well as Kaus, are Caucasian except for Thornton and Clyde who are African-American.  The parties present different accounts as to what happened after Kaus made the joke.

Defendant maintains Thornton and Clyde went to Wysocki's office and reported to Wysocki they were offended by the racist joke Kaus told, that Wysocki immediately called Kaus into his office and informed Kaus the joke was inappropriate and offensive to some of his co-workers, particularly Thornton and Clyde.  Sobilo Affidavit ¶¶ 34-35. Wysocki requested Kaus apologize to Thornton and Clyde who were present at the meeting, and Kaus apologized, but Thornton expressed doubt that Kaus's apology was insincere because Kaus smiled during the apology.  *Id.* ¶¶ 35-36.  Kaus therefore apologized a second time and Wysocki concluded the meeting by informing Kaus that further offensive or inappropriate conduct would result in disciplinary measures against him, including possible discharge.  *Id.* ¶¶ 36-37.  Wysocki's summarized the incident in a report which, on August 14, 2002, was forwarded to Plant Production Manager Gale Culverwell.

In contrast, Kaus asserts that after he made the "off-color" joke,[13] which Kaus maintains "were extremely common in the workplace and were told by employees and managers alike," upon being made aware that Thornton and Clyde were offended by the joke, he immediately offered his apologies to each of them.  Plaintiff's Affidavit ¶¶

---

[13] Although Kaus does not deny making a racially offensive joke, he does deny Defendant's assertions that the joke contained the racially derogatory term "nigger."  Plaintiff's Affidavit ¶ 33.

33-35.  Wysocki inquired whether Thornton and Clyde were satisfied with the apologies, and they replied they were.  *Id*. ¶ 35.

On August 13, 2002, Thornton complained to Supervisor David Flowers ("Flowers") that Kaus continued to racially harass Clyde and her by "bebopping," imitating a "ghetto" or "jive" walk, associated with some African-Americans, as Kaus walked down the hall behind Clyde.  Sobilo Affidavit ¶ 39; Plaintiff's Affidavit ¶ 36.  Kaus denied racially harassing either Thornton or Clyde, explaining that what Thornton had observed, and mistakenly interpreted, was Kaus's "noticeable and pronounced limp" caused by his physical impairments, including degenerative arthritis, severe tendinitis and chronic foot pain caused by his flat feet.  Plaintiff's Affidavit ¶ 37.  On August 14, 2002, Defendant conducted a "fact-finder" investigation to gather evidence about the facts and circumstances of the incident.  Present at the fact-finder investigation were Flowers, Supervisor Charles Luce ("Luce"), Thornton, Clyde and Kaus who was represented by Union Steward Richard Gill ("Gill").  At the conclusion of the fact-finder investigation, Flowers and Luce determined that Kaus should be disciplined for his racially-offensive behavior.  Defendant then suspended Kaus pending further notification from the Human Resources Department and Kaus was escorted from the building.  Sobiolo, as Defendant's Human Resources Manager, reviewed the Fact Finder Report prepared by Flowers and Luce, summarizing their investigation, and determined that Kaus had engaged in gross misconduct and violations of Defendant's Work Rules and Anti-Harassment Policy.  Sobiolo also spoke with Thornton and Clyde regarding their complaints about Kaus.  At a suspension/termination meeting held on August 23, 2002, Sobiolo informed Kaus that he was being terminated for violating the

13

Anti-Harassment Policy.

On August 28, 2002, the Union filed a grievance, under the CBA, challenging Kaus's termination.  A "third-step meeting" on the grievance was held on September 5, 2002 and, on September 6, 2002, Defendant denied the grievance.  On September 15, 2002, the Union Executive Board voted not to proceed with arbitration of Kaus's grievance to arbitration.  Kaus, on October 6, 2002, therefore requested the Union membership vote at the Union's October 20, 2002 meeting to appeal the grievance through arbitration, but the request was denied.

Following the termination of his employment, Kaus applied to the New York State Department of Labor ("DOL") for unemployment benefits.  In granting Kaus's application, the DOL determined that "there is no substantial evidence to support that [Kaus] was walking down the hall like a black person," and that Kaus's knee problems and limp significantly contributed to such determination by Defendant.[14]

Kaus maintains that the termination of his employment for violating Defendant's Anti-Harassment Policy prohibiting racially-offensive behavior was much more severe than disciplinary actions taken against other employees who had violated Defendant's Anti-Harassment Policy.  Specifically, according to Kaus, Joseph Mueller, a white male who used derogatory and racial slurs, was verbally reprimanded and transferred to another department, but was not terminated.  Kaus also claims Angel Oliverio, an Hispanic-American who sexually harassed female employees, was verbally

---

[14] The record is unclear as to whether Defendant opposed Kaus's application for unemployment benefits.  However, a copy of a DOL notice dated September 25, 2002, Plaintiff's Exh. D, containing the DOL's determination that, upon considering information furnished by Defendant, Kaus was eligible for unemployment benefits, suggests that Defendant opposed Kaus's unemployment benefits application, and therefore disagreed with the DOL finding as to Kaus's misconduct as determined by Defendant.

reprimanded and suspended for two weeks, but was not terminated.  Further, Kaus

asserts Kimberly Campbell, an African-American female who engaged in a physical

altercation with another employee,[15] was briefly suspended, but was not terminated.

On January 8, 2003, Kaus filed a charge of employment discrimination based on

race and disability with the Equal Employment Opportunity Commission ("EEOC"),

alleging Defendant failed to accommodate his disability, *i.e.*, arthritic legs and flat feet,

and retaliated against Kaus for requesting an accommodation, chemical resistant

orthopedic boots at the company's expense, by terminating Kaus's employment.  On

March 26, 2003, the EEOC issued a Dismissal and Notice of Rights ("Right to Sue

letter"), dismissing Kaus's employment discrimination charges on the ground that upon

investigating the claim, the EEOC was unable to conclude that Defendant had

discriminated against Kaus because of his race or disability.  This action followed.


## DISCUSSION

### 1.      Summary Judgment

Summary judgment of a claim or defense will be granted when a moving party

demonstrates that there are no genuine issues as to any material fact and that a

moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a) and (b);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The

court is required to construe the evidence in the light most favorable to the non-moving

---

[15] The record does not indicate the race of the employee involved in the altercation with Campbell.

party.  *Tenenbaum v. Williams*, 193 F.3d 58, 593 (2d Cir. 1999) (citing *Anderson, supra*, 477 U.S. at 255).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex, supra*, 477 U.S. at 322; *see Anderson, supra*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  In assessing a record to determine whether there is genuine issue of material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.  *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex, supra*, 477 U.S. at 323-24 (1986) (quoting Fed.R.Civ.P. 56).  Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case."  *Nora Beverages, Inc. v. Perrier Group of*

16

*America, Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  Once a party moving for summary

judgment has made a properly supported showing as to the absence of any genuine

issue as to all material facts, the nonmoving party must, to defeat summary judgment,

come forward with evidence that would be sufficient to support a jury verdict in its favor.

*Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

Although a summary judgment motion may be made with or without supporting

affidavits, if affidavits are submitted, they "shall be made on personal knowledge, shall

set forth such facts as would be admissible in evidence, and shall show affirmatively

that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P.

56(a).  Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in
> this rule, an adverse party may not rest upon the mere allegations or denials of
> the adverse party's pleading, but the adverse party's response, by affidavits or
> as otherwise provided in this rule, must set forth specific facts showing that there
> is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

"However, if the motion for summary judgment is not made and supported as provided

in Rule 56, the Rule does not impose on the party opposing summary judgment an

obligation to come forward with affidavits or other admissible evidence of his own."  *St.*

*Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000) (reversing granting of summary

judgment in favor of defendant because defendant failed to allege factual basis for

assertions contained in defendant's affidavit such that plaintiff, as the party opposing

summary judgment, was not required to adduce evidence to defeat summary judgment

and the "self-serving" nature of plaintiff's affidavit statements went to the weight of the

statements, rather than to their admissibility).

17

Nevertheless, vague assertions supported only by self-serving statements in the nonmoving party's affidavit are insufficient to defeat a properly supported summary judgment motion. *Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286, 1292 (2d Cir.), *cert. denied*, 419 U.S. 1022 (1974). "The non-moving party may not rely on conclusory assertions or unsubstantiated speculation [to defeat summary judgment]." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Rather, "the non-movant must produce specific facts indicating that a genuine factual issue exists." *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998) (underlining added). The ultimate inquiry on a summary judgment motion is whether any reasonable jury could find the plaintiff's evidence meets the requisite burden of proof. *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 122-23 (2d Cir. 2004).

In the instant case, Defendant argues in support of summary judgment that the undisputed material facts demonstrate that Defendant is entitled to judgment as a matter of law on all nine claims for relief. Defendant's Memorandum at 1. Kaus, in opposing summary judgment, argues that genuine and material questions of fact exist and prohibit summary judgment on all his claims. Plaintiff's Memorandum at 1.


2.    **Burden-shifting Analysis**

In analyzing an employment discriminatory discharge claim under Title VII, courts employ a burden-shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). The same "McDonnell-Douglas burden-shifting analysis" employed by the Supreme Court in analyzing employment discrimination claims under Title VII also applies to employment

discrimination claims under the ADA, *Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999).  Furthermore, the *McDonnell Douglas* burden-shifting analysis also applies to employment discrimination claims based on race and disability brought under New York's HRL.  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir. 2000) ("Our consideration of claims brought under [New York] state and city human rights laws parallels the analysis used in Title VII claims.").

Under the *McDonnell Douglas* burden-shifting test, the plaintiff bears the initial burden of proving, by a preponderance of the evidence, a *prima facie* case of discrimination.  *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993) ("Under the *McDonnell Douglas* scheme, '[e]stablishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee.'") (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  The plaintiff's burden of establishing a *prima facie* case of employment discrimination is *de minimus*.  *Chambers*, *supra*, 43 F.3d at 37.  Once the plaintiff establishes a *prima facie* case of employment discrimination, the burden then shifts to the defendant to prove through admissible evidence a legitimate, non-discriminatory reason for its actions sufficient to support a finding by the trier of fact that unlawful discrimination was not the reason for the disputed employment action.  *Chambers*, *surpa,* 43 F.3d at 38.  *See St. Mary's Honor Center*, *supra*, 509 U.S. at 506-07 (establishing a *prima facie* case or "presumption" of employment discrimination produces the required conclusion of employment discrimination, absent an explanation by the defendant rebutting the *prima*

19

*facie* case with evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason).  Nevertheless, the ultimate burden of production rests with the plaintiff who is then required to show that the proffered reason was merely a pretext for the alleged discrimination which "may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the *prima facie* case, without more."  *Chambers*, *supra*, 43 F.3d at 38 (citing *St. Mary's Honor Center*, *supra*, 509 U.S. at 507).

Although the court must be "especially cautious" in deciding a summary judgment motion in an employment discrimination case given that the employer's intent is often at issue and must be carefully scrutinized to reveal circumstantial evidence supporting an inference of discrimination, *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999), summary judgment may properly resolve even a "fact-intensive" employment discrimination case.  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  Further, a plaintiff opposing summary judgment, even in an employment discrimination case, cannot rely on mere "conjecture or surmise, and must do more than simply show that there is some metaphysical doubt as to the material facts." *Heilweil v. Mount Sanai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994) (internal quotes omitted).  As such, "the salutary purposes of summary judgment - - avoiding protracted, expensive and harassing trials - - apply no less to discrimination cases than to commercial or other areas of litigation."  *Meire v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

In the instant case, Defendant argues in support of summary judgment that Kaus

cannot establish a *prima facie* case of employment discrimination based either on race

or disability.  Defendant's Memorandum at 3-7 (race), 9-13 (disability).  Defendant also

maintains Kaus cannot establish a *prima facie* case of employment discrimination

based on its failure to accommodate Kaus's alleged disability.  Defendant's

Memorandum at 14-17.  Further, Defendant asserts that Kaus has failed to exhaust

available administrative remedies as to his disability-based harassment claim,

specifically, that Kaus failed to include such claim in his complaint filed with the EEOC,

but that even if Kaus has exhausted such claim, it is without merit. *Id*. at 17-21.

Defendant alternatively argues that even assuming the court finds Kaus has

established a *prima facie* case of employment discrimination based on either race or

disability, Defendant has articulated a legitimate, non-discriminatory reason for

terminating Kaus's employment, specifically, that Kaus violated Defendant's Anti-

Harassment Policy prohibiting Kaus from racially harassing his co-workers. *Id*. at 7-8,

13-14.  Finally, Defendant argues Kaus is unable to establish a *prima facie* case of

retaliation based on disability. *Id*. at 21-23.


3.    **Employment Discrimination Based on Race**[16]

Kaus alleges he was discriminated because of his race in violation of Title VII

and the HRL when Defendant terminated his employment ostensibly for telling a racist

joke.  Complaint ¶¶ 41-47.  Defendant maintains that Kaus, who is white, cannot

---

[16] As Kaus's employment discrimination claims must be considered upon the burden-shifting test applicable to employment discrimination claims based on race, and as Kaus's disability-based claims are subject to the same test, the court, in the interest of clarity, first addresses Kaus's race-based employment discrimination claims.

establish a *prima facie* case of race discrimination because Kaus cannot demonstrate

that his termination occurred under circumstances giving rise to an inference of

discrimination, and that Kaus's termination was not solely predicated on the racist joke

but, rather, was also predicated on Kaus's imitating an African-American "ghetto" or

"jive" style walk in the presence of Thornton and Clyde to harass them.  Defendant's

Memorandum at 4-8.  Although Kaus's papers submitted in opposing summary

judgment are devoid of any argument in support of his race discrimination claims under

Title VII and New York's HRL, Kaus does not concede that summary judgment should

be granted in favor of Defendant on these claims.  Moreover, although both Defendant

and Kaus submitted additional papers in support of their positions on the pending

summary judgment motion, neither party further addresses Kaus's race-based

employment discrimination claims.

Generally, in order to establish a *prima facie* case of race discrimination, a

plaintiff must demonstrate: (1) membership in a protected racial minority class; (2)

satisfactory job performance; (3) an adverse employment action; and (4) such action

occurred under circumstances giving rise to an inference of discrimination based on

membership in the protected class.  *Stern v. Trustees of Columbia University in the City

of New York*, 131 F.3d 305, 311-12 (2d Cir. 1997) (citing *Burdine*, *supra*, 450 U.S. at

253 & n. 6, *Chambers*, *supra*, 43 F.3d at 37, and *Rosen v. Thornburgh*, 928 F.2d 528,

532 (2d Cir. 1991)).  The instant case, however, is not a typical race discrimination case

given that Kaus, a Caucasian, is not a member of a protected racial minority class.  *See

Seils v. Rochester City School Dist.*, 192 F.Supp.2d 100, 108 (W.D.N.Y. 2002)

(observing in the context of race-based employment discrimination case although

plaintiffs, both of whom were Caucasian, were "not members of any minority group," plaintiff could bring race-based employment discrimination action under Title VII). Accordingly Kaus actually claims reverse racial discrimination against Defendant. *Seils*, *supra*, 192 F.Supp.2d at 108.

The Supreme Court has recognized that race-based employment discrimination is prohibited, even where the complaining party's race is Caucasian. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-79, 283 (1976) (holding that Title VII is not limited to discrimination against members of any particular race but, rather, Title VII prohibits racial discrimination in private employment against white persons upon the same standards as racial discrimination against nonwhites). *See Keating v. Carey*, 706 F.2d 377, 383 & n. 8 (2d Cir. 1983) (observing in context of race discrimination action under 42 U.S.C. § 1981 that statute's "reference to 'white citizens' was not intended to limit the otherwise broad language of the statute protecting 'all persons,' including whites, from discrimination on account of race" and citing *McDonald*, *supra*, 427 U.S.).

Courts, however, have had difficulty attempting to determine whether a plaintiff has established a *prima facie* case of reverse discrimination because the first prong, *i.e.*, membership in a protected racial minority class, cannot be met. *See Seils*, *supra*, 192 F.Supp.2d at 108-09 (observing that courts have "struggled in attempting to apply the *McDonell Douglas* burden-shifting framework to Title VII suits by Caucasian plaintiffs" because of "the wording of the first prong of the test"). In response, some courts, having adopted the analysis articulated by the court in *Parker v. Baltimore & O.R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir. 1981) ("the *Parker* analysis"), require Caucasian plaintiffs, instead of showing minority group status, to establish "background

circumstances" supporting the assertion that the defendant employer discriminates,

based on racial consideration, against the majority. *See*, *e.g.*, *Mills v. Health Care Serv.*

*Corp.*, 171 F.3d 450, 457 (7th Cir. 1999); *Duffy v. Wolle*, 123 F.3d 1026, 1036-37 (8th

Cir. 1997).   Other courts, however, have rejected the *Parker* analysis, concluding that

substituting "background circumstances" for membership in a minority class imposes a

more onerous burden on reverse discrimination plaintiffs, favoring instead "a standard

under which a plaintiff who brings a reverse discrimination suit under Title VII should be

able to establish a *prima facie* case in the absence of direct evidence of discrimination

by presenting sufficient evidence to allow a reasonable fact finder to conclude (given

the totality of the circumstances) that the defendant treated plaintiff less favorably than

others because of his race, color, religion, sex or national origin."   *Seils*, *supra*, 192

F.Supp.2d at 109 (citing *Iadimarco v. Runyon*, 190 F.3d 151, 157-63 (3d Cir. 1999)).

The Second Circuit has not taken a position on this issue in any published case, and

district courts within the Second Circuit are split on the issue.   *Compare*, *e.g.*, *Olenick v.*

*New York Telephone*, 881 F.Supp. 113, 114 (S.D.N.Y. 1995) (applying "Parker"

background circumstances analysis); and *Umansky v. Masterpiece Intern. Ltd.*, 1998

WL 433779, *3 n. 3  (S.D.N.Y. July 31, 1998) (following *Olenick*, *supra*, 881 F.Supp.),

with *Cunliffe v. Sikorsky Aircraft Corp.*, 9 F.Supp.2d 125, 130 n. 3 (D.Conn. 1998)

(rejecting *Olenick*, *supra*); *Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F.Supp.2d

249, 260-62 (E.D.N.Y. 1999) (rejecting "background circumstances" test in favor of

assessing whether inference can be drawn from the established facts that employer

treated Caucasian plaintiff less favorably because of their race); and *Cully v. Milliman &*

*Robertson, Inc.*, 20 F.Supp.2d 636, 641 (S.D.N.Y. 1998) (rejecting *Olenick*, *supra*).

In the instant case, however, the court need not decide this issue because even assuming, *arguendo*, that Kaus can establish the first prong of a *prima facie* case of reverse employment discrimination, under whatever standard the Second Circuit, in a published decision,[17] would decide is correct, whether the *Parker* analysis or the totality of the circumstances analysis followed by the Third Circuit in *Iadimarco, supra*, 190 F.3d, Kaus cannot establish the required fourth prong for an actionable claim, *i.e.*, that the adverse employment action, his discharge, occurred under circumstances giving rise to race-based discrimination.[18]

Circumstances held to have given rise to the necessary inference of discrimination to establish the fourth element of a *prima facie* employment discrimination include (1) the employer sought to replace a discharged plaintiff with another person possessing the same qualifications, although not a member of the same protected class as the plaintiff, (2) the employer criticized the plaintiff's work performance in terms degrading to the protected class; (3) the employer made invidious comments about others in the plaintiff's protected class; (4) disparate treatment, *i.e.*, the employer more favorably treated employees not in the protected class; (5) the sequence of events leading to the adverse employment action; and (6) the timing of the adverse employment action. *Chambers, supra*, 43 F.3d at 37 (citing cases). In the

---

[17] The court notes the Second Circuit has applied the totality of the circumstances analysis in at least one unpublished decision, *Vallone v. Lori's Natural Food Center, Inc.*, 199 F.3d 1324, *1 (2d Cir. 1999) (Table); but, in accordance with Second Circuit directives, the court does not rely on such unreported cases as precedent in the instant case.

[18] The parties do not dispute that Kaus can establish the remaining prongs of a *prima facie* case of employment discrimination based on race, including that Kaus satisfactorily performed his job (second prong) and that Kaus suffered an adverse employment action, *i.e.*, termination (third prong).

instant case, Kaus maintains that he was subjected to disparate treatment when he was terminated for telling, as a Caucasian, an allegedly racist joke directed against African-Americans while, as relevant, other African-American employees who engaged in similar violations of the Anti-Harassment Policy were not as severely disciplined.

A showing under the fourth requisite step to establishing a *prima facie* case of employment discrimination based on disparate treatment, *i.e.*, that employees belonging to one racial group received more favorable treatment than similarly situated employees belonging to a different racial group, can also serve as evidence that the employer's proffered legitimate non-discriminatory reason for an adverse job action was a pretext for racial discrimination. *Graham, supra*, 230 F.3d at 43 (citing *Hargett v. National Westminster Bank, USA*, 78 F.3d 836, 839 (2d Cir. 1996)). A jury's finding that the facts demonstrate disparate treatment of similarly situated employees belonging to different racial groups could also support a finding that the employer's articulated non-discriminatory reason for the adverse employment action was pretextual, thereby precluding summary judgment under the third prong of the *McDonnell Douglas* burden-shifting test. *Graham, supra*, 230 F.3d at 43 (citing *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998)).

A plaintiff may establish that an adverse employment action occurred under circumstances giving rise to an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham*, *supra*, 230 F.3d at 39 (citing cases). Although whether two or more employees are similarly situated generally presents a question of fact of the jury, to avoid summary judgment, the

plaintiff must demonstrate that he was "'similarly situated in all material aspects'" to the individuals to whom the plaintiff compares himself. *Graham*, *supra* 230 F.3d at 39 (citing cases and quoting *Shumway v. United Parcel Serv. Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).  What constitutes "all material respects,"however, varies from case to case and "must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id*. at 40.  "In other words, there should be an 'objectively identifiable basis for comparability.'"  *Id*. (quoting *Cherry v. American Tel. & Tel. Co.*, 47 F.3d 255, 299 (7th Cir. 1995)).

In the instant case, the evidence proffered by Kaus fails to demonstrate that the circumstances surrounding the termination of his employment give rise to an inference of race-based discrimination because no disciplinary records of any similarly situated employees establishes that any non-white employees were treated more favorably for similar workplace violations.  As discussed, Facts, *supra*, at 14-15, in opposition to summary judgment, Kaus compares the termination of his employment for telling a racist joke in violation of Defendant's Anti-Harassment Policy with disciplinary measures taken with respect to other employees who violated such policies.  Specifically, Joseph Mueller ("Mueller"), a white male who used derogatory and racial slurs, was verbally reprimanded and transferred to another department, but was not terminated.  Angel Oliverio ("Oliverio"), an Hispanic-American who sexually harassed female employees, was verbally reprimanded and suspended for two weeks, but was not terminated. Further, Kimberly Campbell ("Campbell"), and African-American female who engaged in

a physical altercation with another employee, whose race is not specified, was briefly suspended, but was not terminated.

The parties do not dispute that Mueller, Oliverio and Campbell were all subject to the same workplace standards by Defendant as was Kaus.  Nor do the parties dispute that the conduct for which Mueller, Oliverio and Campbell were disciplined was of comparable seriousness to the conduct for which Kaus was disciplined.  However, even if Plaintiff could avoid summary judgment on this issue, the remaining issue becomes whether the discipline meted out to Mueller, Oliverio and Campbell for violating similar workplace policies at Defendant was more favorable than the disciplinary measures taken against Kaus, *i.e.*, suspension followed by termination, for violating Defendant's Anti-Harassment Policy.  The undisputed facts on this issue establish that Kaus was not subjected to disparate treatment, whether based on his race or otherwise.

Specifically, Kaus's assertion that he was treated less favorably than Mueller, who also told a racially-offensive joke, including the same racial slur allegedly contained in the joke told by Kaus, but was transferred to another department, rather than discharged, cannot support an inference of discrimination based on race because Mueller, like Kaus, is also Caucasian.  Sobiolo Affidavit ¶ 53.  Further, although Oliverio, who is Hispanic, and Campbell, who is African-American, were both given two-week suspensions for violations of Defendant's workplace policies, after being suspended for the initial workplace policy infractions, unlike Kaus, no further complaints of improper behavior, particularly under Defendant's Anti-Harassment Policy, were received against either Oliverio or Campbell.  Sobiolo Affidavit ¶ 56.  In contrast, it is undisputed that Kaus initially received less severe discipline for violating Defendant's

Anti-Harassment Policy by making a racist joke, *i.e.*, a verbal reprimand, and it was only

after Kaus continued to violate the policy by walking behind Clyde in a racially offensive

manner, as determined by Defendant, that Kaus's employment was terminated.

Sobiolo Affidavit ¶ 57.  Significantly, Kaus has not submitted anything contradicting

Sobiolo's explanation as to why the final disciplinary action taken against Kaus was not

more severe than the disciplinary action taken against other, non-white employees who

were involved in behavior of comparable seriousness.  *Graham*, *supra*, 230 F.3d at 40.

Finally, Kaus does not assert that Defendant's Anti-Harassment Policy is, *per se*, a form

of reverse discrimination.  Therefore, as it is undisputed that Kaus was disciplined

because he violated, for a second time, the Anti-Harassment Policy, Defendant's

reason for doing so was also nondiscriminatory in nature and, upon this record, no

reasonable juror could find otherwise.

Accordingly, Kaus has failed to establish a *prima facie* case of employment

discrimination based on race and, thus, Kaus's Eighth and Ninth Causes of Action are

without sufficient merit to require trial.  Summary judgment should, therefore, be

GRANTED in favor of Defendant as to this aspect of its motion.


**4.     Disability-based Employment Discrimination**

Kaus, who suffers from various physical impairments including pes valgus (flat

feet), degenerative arthritis and severe tendinitis in his knees, ankles and feet, alleges

Defendant discriminated against him with regard to his employment based on Kaus's

claimed disabilities in violation of the ADA and New York' HRL by failing to

accommodate Kaus's disabilities, Complaint ¶¶ 12-18 (ADA), and ¶¶ 26-28 (HRL) and

regarding Kaus as disabled, Complaint ¶¶ 29-31 (ADA), and ¶¶ 38-40 (HRL), and

harassed and discriminated against Kaus in violation of the ADA, Complaint ¶¶ 19-25;

and retaliated against Kaus for requesting an accommodation of his disabilities, in

violation of the ADA and the HRL, Complaint ¶¶ 32-34 (ADA), and ¶¶ 35-37 (HRL).

Defendant moves to dismiss these claims on the basis that Kaus has failed to and

cannot establish a *prima facie* case of disability based employment discrimination

because Kaus is not a qualified individual with a disability within the meaning of the

ADA, Plaintiff's Memorandum at 9-12, Defendant never regarded Kaus as disabled,

Plaintiff's Memorandum at 12-13; Kaus cannot demonstrate that he was more severely

disciplined for violating Defendant's Anti-Harassment Policy based on his asserted

disability than any similarly situated employee who was not disabled, *id.* at 13-14, there

is no evidence in the record establishing that Kaus required a reasonable

accommodation to enable him to perform the essential functions of his job, *id.* at 14-17,

Kaus failed to exhaust his ADA harassment claim which is also without merit, *id.* 17-21,

nor can Kaus establish a *prima facie* case that Defendant retaliated against him for

requesting a reasonable accommodation for his disability, *id.* at 21-23.

Kaus argues in opposition to summary judgment on his ADA claims that he has

established a *prima facie* case of disability-based employment discrimination because

evidence in the record demonstrates he is either disabled, or was regarded by

Defendant as disabled, under both the ADA and the HRL, Plaintiff's Memorandum at 4-

8, and that Defendant failed to reasonably accommodate Kaus's disability, including his

requests for chemical resistant orthopedic work boots and to transfer him to a less

physically strenuous position in another department, in violation of the ADA and the

HRL, Plaintiff's Memorandum at 8-12.  Kaus alternatively argues that Defendant's proffered reasons for his termination were mere pretext to conceal the true reason for his dismissal, *i.e.*, Kaus's disability, whether actual or perceived, Plaintiff's Memorandum at 12-14, and to retaliate against Kaus for requesting a reasonable accommodation of Kaus's disability, *id.* at 14-17.  Kaus further suggests that Defendant fabricated the "ghetto" or "jive" walking incident to retaliate against Kaus.  Plaintiff's Memorandum at 13-14, 17.

Defendant argues in further support of summary judgment that Plaintiff's Fact Statement failed to satisfy the Local Rule 56.1(b)'s requirement that Defendant's Fact Statement be specifically controverted, Defendant's Reply Memorandum at 1-2, and, therefore, Defendant's Fact Statement shall be considered as uncontroverted.[19]

---

[19] The uncontroverted statements of material fact include the following:

1.   "Kaus' [*sic*] assignment performing label inspections in the Tomato Department was a temporary light duty position after which he returned to work without restrictions."  Defendant's Reply Memorandum at 2 (citing Defendant's Fact Statement ¶¶ 19-20);

2.   "Kaus never provided medical documentation to Carriage House supporting his request for an accommodation."  Defendant's Reply Memorandum at 2 (citing Defendant's Fact Statement ¶¶ 24, 27);

3.   "When Kaus decided that the new boots Carriage House helped him obtain were insufficient, he did never requested [*sic*] further help from Carriage House to obtain different boots."  Defendant's Reply Memorandum at 2 (citing Defendant's Fact Statement ¶ 26);

4.   "Willie Clyde and Suzie Thompson complained to management concerning the 'ghetto' and 'jive' walk and they were interviewed as part of the Fact Finder and during Gary Sobilo's consideration of the issue."  Defendant's Reply Memorandum at 2 (citing Defendant's Fact Statement ¶¶ 43, 46, 50);

5.   "The co-workers allegedly treated more favorably than Kaus were disciplined for a single offense, and there were no further complaints about their behavior, unlike Kaus, who persisted with racially offensive behavior after being warned about the inappropriateness of the joke he told."  Defendant's Reply Memorandum at 2 (citing Defendant's Fact Statement ¶¶ 54-57); and

6.   "The Union's own investigation of the matter included conversations with Willie Clyde and Suzie Thornton."  Defendant's Reply Memorandum at 2 (citing Defendant's Fact Statement ¶ 58).

Further, Defendant reiterates its argument in support of summary judgment that Kaus is

not disabled within the meaning of either the ADA or the HRL, Defendant's Reply

Memorandum at 2-6, and that Kaus has failed to demonstrate the existence of a

material issue of fact that Defendant failed to accommodate his alleged disability, *id.* at

6-8.  Defendant also challenges Kaus's suggestion that Defendant fabricated the

"ghetto" or "jive" walk incident to retaliate against Kaus, given that Kaus, in his affidavit

submitted in opposition to summary judgment, suggests that his limp was mistaken for

the racially offensive mannerisms, *id.* at 8, and further asserts that no issue of fact,

even if decided in Kaus's favor, could support Kaus's version of the events leading to

the termination of his employment.  *Id.* at 8-10.  The court initially considers whether

Kaus has established a *prima facie* case of disability-based employment discrimination

under either the ADA or New York's HRL which, although similar, are not identical in

their definitional scope.  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.

2000).  Because different tests are employed under the ADA and the HRL in assessing

whether an individual qualifies as an individual with a disability, the court separately

addresses Kaus's claims under each law.


A.    ADA

"The ADA prohibits discrimination by covered entities, including private

employers, against qualified individuals with a disability.  Specifically, it provides that no

covered employer 'shall discriminate against a qualified individual with a disability

because of the disability of such individual in regard to . . . [the] discharge of

employees. . . . .'"  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 477-48 (1999)

(quoting 42 U.S.C. § 12112(a)).  To establish a *prima facie* case of discrimination under

the ADA, the plaintiff must establish by a preponderance of the evidence that (1) his

employer is subject to the ADA; (2) he suffers from a disability within the meaning of the

ADA; (3) he was otherwise qualified to perform the essential functions of the job with or

without a reasonable accommodation; and (4) he suffered an adverse employment

action based on his disability.  *Reeves v. Johnson Controls World Services, Inc.*, 140

F.3d 144, 149-50 (2d Cir. 1998) (citing *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867,

869-70 (2d Cir. 1998)).

To be subject to the ADA, an employer must be "engaged in an industry affecting

commerce who has 15 or more employees for each working day in each of 20 or more

calendar weeks in the current or preceding calendar year."  29 C.F.R. § 1630.2(e)(1).

In the instant case, that Defendant is an employer subject to the ADA is not disputed.

Rather, what is disputed are the remaining three elements, specifically, whether Kaus

suffers from a disability within the meaning of the ADA, whether Kaus required, but was

denied, a reasonable accommodation of his disability to perform his job, and whether

the adverse employment action, *i.e.*, the termination of Kaus's employment, was based

on said disability.


### 1.    *Prima Facie* Case of Disability under the ADA

The ADA protects only Kaus only if Kaus is a "qualified individual with a

disability," 42 U.S.C. § 12112(a), defined as

> an individual with a <u>disability</u> who, with or without reasonable accommodation,
> can perform the essential functions of the employment position that such
> individual holds . . . .

42 U.S.C. § 12111(8) (underlining added).

Further, as relevant, the ADA defines a "disability" as

> (A) a physical or mental impairment that <u>substantially limits one or more of the major life activities of [an] individual</u>;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (underlining added).

The Equal Employment Opportunity Commission ("EEOC") has promulgated administrative regulations implementing the ADA.  *Reeves*, *supra*, 140 F.3d at 150 (citing 29 C.F.R. § 1630).  A physical impairment is defined in the EEOC regulations as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin and endocrine."  29 C.F.R. § 1630.2(h)(i).  EEOC regulations regarding the ADA define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  29 C.F.R. § 1630.2(l).  The EEOC has also "issued an 'Interpretive Guidance' which provides that '[t]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines or assistive or prosthetic devices.'"  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 480 (1999) (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j) (1998) (describing § 1630.2(j)).  The Department of Justice has issued a similar guideline, *i.e.*, 28 C.F.R. pt. 35, App. A, § 35.104 ("the question of whether a person has a disability should be assessed without

regard to the availability of mitigating measures, such as reasonable modification or auxiliary aids and services."). The Supreme Court, however, has yet to articulate what deference must be afforded such guidelines. *See Sutton*, *supra*, 527 U.S. at 480 (refraining from deciding "what deference is due" the interpretive guidelines issued by agencies regarding the ADA).[20]

As stated, Defendant does not dispute that Kaus suffers from degenerative arthritis and tendinitis in his lower extremities and pes valgus. Rather, Defendant maintains that none of Kaus's physical difficulties, individually or in combination, substantially limits one or more of Kaus's major life activities which, in the instant case, include walking and working. Defendant's Memorandum at 9-12. Although Defendant does not dispute that walking is a major life activity, Defendant does not similarly concede that "working" is a major life activity. Defendant's Memorandum at 10-12. Defendant further asserts that insofar as walking and working qualify as major life activities under the ADA, upon this record, as to Kaus, such activities are not "substantially limited" by the effect of Kaus's physical impairments, and no reasonable juror could find otherwise. *Id.*

The Supreme Court, instructing as to the implementation of the ADA, has held that a person whose physical impairment "is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity."

---

[20] In the absence of any direction to the contrary by the Supreme Court of the Second Circuit Court of Appeals, the court affords the regulations and interpretive guidelines some deference. *See Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001) ("Because the Equal Employment Opportunity Commission ('EEOC') is the agency that bears responsibility for implementing specific provisions of the ADA, we generally defer to the EEOC regulations in construing ADA's terms."). However, in the instant case, reliance on none of the regulations or interpretive guidelines changes the result of any recommended disposition as to any issue.

*Sutton*, *supra*, 527 U.S. at 482-83.  Significantly, in *Sutton*, *supra*, the Supreme Court specifically rejected the EEOC's guidelines that, to the contrary, called for persons alleging disability-based discrimination "to be evaluated in their hypothetical uncorrected state" as "an impermissible interpretation of the ADA."  *Sutton*, *supra*, 527 U.S. at 482.  The Supreme Court has further instructed that the term "'[m]ajor life activities' refers to those activities that are of central importance to daily life."  *Toyota Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002).  Accordingly, "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  *Williams*, *supra*, 534 U.S. at 198.  "The impairment's impact must also be permanent or long term."  *Id*. (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii).

As to the impact of Kaus's alleged disabilities on his ability to walk, "[c]ourts have placed the bar relatively high when determining when the activity of walking has been substantially limited."  *Potenza v. City of New York Department of Transportation*, 2001 WL 1267172 (S.D.N.Y. Oct. 23, 2001) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 106-08 (3d Cir. 1996) (holding plaintiff who did not require crutches or cane, despite trouble climbing stairs or walking any significant distances, was not substantially limited in his ability to walk)), *aff'd*, 95 Fed. Appx. 390 (2d Cir. 2004) (Table).

In *Kelly*, *supra*, 94 F.3d 102, the court considered the impact of the plaintiff's hip injury, which caused the plaintiff to limp, and held that such physical impairment failed to establish that the plaintiff had a physical disability that substantially limited his ability to walk, given that the plaintiff presented no evidence that he required any special

36

devices, such as a cane or crutches, to help him walk.  *Kelly*, *supra*, 94 F.3d at 106-08.

In concluding that the plaintiff was not substantially impaired in his ability to walk, the

court relied on the *EEOC Compliance Manual*[21] and the EEOC regulations.  *Kelly*,

*supra*, 94 F.3d at 106.  In particular, the Appendix to the relevant EEOC regulations,

providing interpretive guidance on the ADA, states

> [A]n individual who, because of an impairment, can only walk for very brief
> periods of time would be substantially limited in the major life activity of walking.
> An individual who used artificial legs would likewise be substantially limited in the
> major life activity of walking because the individual is unable to walk without the
> aid of prosthetic devices.

29 C.F.R. Pt. 1630 App. § 1630.2(j).

However, as discussed, Discussion, *supra*, at 34-36, the Supreme Court has rejected

the contention that an individual alleging a disability as defined under the ADA must be

evaluated in his "hypothetical uncorrected state."  *Sutton*, *supra*, 527 U.S. at 482.

Rather, in considering whether an individual has a disability within the meaning of the

ADA, "it is apparent that if a person is taking measures to correct for, or mitigate, a

physical or mental impairment, the effects of those measures - - both positive and

negative - - must be taken into account when judging whether that person is

'substantially limited' in a major life activity and thus 'disabled; under the [ADA]."  *Id*.

    In the instant case, Kaus alleges that his ability to walk is hindered by several

physical impairments, including degenerative arthritis and severe tendinitis in his knees,

ankles and feet, and flatfeet.  Plaintiff's Affidavit ¶ 3.  According to Kaus, as a result of

---

[21] "The *EEOC Compliance Manual* explains that it was 'issued for use by EEOC investigators
when investigating charges of discrimination under the ADA' and that section 902 in particular provides
guidance for determining whether an individual should be considered disabled."  *Kelly*, *supra*, 94 F.3d at
106 n. 5 (citing and quoting 2 *EEOC Compliance Manual* § 902, at 1).

these impairments, he "cannot bend, twist, kneel, lift or climb," walking is difficult and painful and he walks with a "pronounced limp."  *Id*.  Kaus further claims, without any supporting medical opinion, that "walking for any amount of time aggravates [his] medical conditions and causes severe inflammation and painful swelling," and Kaus must use a cane or other assistive device to negotiate stairs.  *Id*.  It is undisputed that Kaus underwent a surgical procedure, "open medial meniscectomy," on his knee, *id*., but no medical opinion thereafter suggests any significant limitations of Kaus's ambulatory capacity.

Nor does Kaus provides any medical evidence substantiating the extent of his physical impairments on his ability to walk, even with orthotic shoes.  In fact, the only medical evidence in the record as to any restrictions on any of Kaus's physical abilities are copies of recommendations by Dr. Kim, whose medical pedigree is unknown, and Dr. Ouweleens, who examined Kaus in connection with the knee injury Kaus sustained on September 1, 2000 while working in the Tomato Department, Defendant's Exh. O, a copy of a note written by Kaus's podiatrist, Dr. Zimmer, releasing Kaus to return to work following medical leave in April 2002, Defendant's Exh. P, and copies of treatment notes pertaining to these same incidents, Plaintiff's Exhs. A through C.

Specifically, on October 31, 2000, Dr. Kim restricted Kaus from "bending" and "repetitive climbing" only until Kaus was examined again on November 29, 2000. Defendant's Exh. O.  On November 29, 2000, Dr. Ouwelleen, an orthopedic specialist, indicated on a Certificate to Return to Work that Kaus could work, but with restrictions, including no bending and repetitive climbing until December 7, 2000, when Kaus was to be examined again, Defendant's Exh. O, and wrote in a letter to Travelers Insurance

38

Company that Kaus had "work related exacerbation of right knee degenerative arthritis,"

restricting Kaus, who "does not like medication," to "no repetitive climbing and no

bending over to avoid hyperextension of the knee."  Plaintiff's Exh. A.  *Id*.  Significantly,

Dr. Ouwelleen stated on a second Certificate to Return to Work dated December 7,

2000, that Kaus "is able to return to full duty as of 12/7/00."  *Id*. (underlining added).

Significantly, no mention is made by Dr. Ouweleen of any need for an accommodation

such as orthotic work shoes, to enable Kaus to return to such "full duty."  Although

Defendant granted Kaus's request for medical leave from April 12 to 22, 2002, to permit

Kaus to seek treatment for his various impairments to his lower extremities, Dr. Zimmer,

Kaus's podiatrist, in a note dated April 12, 2002, stated that Kaus could return to work

without any restrictions as of April 25, 2002.  Defendant's Exh. P.  Dr. Zimmer's

treatment notes during Kaus's medical leave demonstrate that although Dr. Zimmer

diagnosed Kaus with tendinitis and flat feet, requiring Kaus to obtain "custom

supporting orthotic devices" and that Kaus "may require long term supportive devices in

his shoes,"[22] Plaintiff's Exh. B, *see also* Plaintiff's Exh. C (reiterating that Kaus must

obtain supportive foot wear for work).  Nevertheless, nothing in the record indicates that

Kaus's asserted physical problems have interfered with Kaus's ability to walk, either at

work or generally, as Kaus alleges.  Thus, Kaus's own assertions of the severity of his

physical disabilities alone, without any supporting medical evidence, provide "an

insufficient basis to avoid summary judgment" on an ADA claim.  *Dietrich v. E.I. DuPont

De Nemours & Co.*, 2004 WL 2202656, * 8 (W.D.N.Y. Sept. 28, 2004) (citing cases).

---

[22] Dr. Zimmer did not indicate whether Kaus would need to use such "supportive orthotic devices" in his shoes only at work, or also for everyday activities such as walking or climbing stairs.

Kaus, moreover, points to no case in which the court held that the moderate difficulties posed by Kaus's self-described asserted physical limitation on his ability to walk or to climb stairs constitutes a "disability" within the meaning of the ADA.

The record is equally devoid of any evidence demonstrating a question of fact which, if decided in Kaus's favor, would establish that Kaus's impairments, even in the absence of mitigating measures, substantially limit his ability to engage in the major life activity of working. "Work is specifically included in the regulations as an activity fitting within the definition of 'major life activity' for ADA purposes." *Dietrich*, *supra*, 2004 WL 2202656 at * 8 (citing 29 C.F.R. § 1630.2(i)).[23]  Whether an impairment "substantially limits" an individual's ability to work depends on the range of jobs for which the individual is disqualified by his impairment. *Dietrich*, *supra*, 2004 WL 2202656 at *8 ("In the context of an ADA claim alleging an inability to work, '[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one.'") (quoting *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994)). Further, regulations promulgated regarding the inability to work provide, in relevant part:

> With respect to the major life activity of working - -
> (i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. <u>The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.</u>

---

[23] The Supreme Court has questioned whether one's ability to work, *per se*, is properly considered a major life activity under the ADA. *Sutton, supra*, 527 U.S. at 491-92.  Assuming, *arguendo*, such question would be answered in the negative, Kaus, in the instant action, would be unable to claim he was disabled under the ADA solely because his alleged impairments substantially limited his ability to work.  In any case, as the alleged limitations on Kaus's capacity to ambulate may, according to Kaus's own physicians, be ameliorated by use of orthotic shoes, or even arch support devices, such physical limitations, if any, cannot qualify as a protected disability under the ADA. *Sutton*, *supra*, 527 U.S. at 483.

29 C.F.R. § 1630.2(j)(3)(i) (underlining added).

Here, the record is barren of any admissible evidence from which a reasonable

trier of fact could find that Kaus's ability to work was substantially limited within the

meaning of the ADA.  As discussed in connection with Kaus's asserted limitations to his

ability to work posed by his physical impairments, Discussion, *supra*, at 37-40, no

physician or other medical source has indicated that Kaus's ability to "perform either a

class of jobs or a broad range of jobs in various classes as compared to the average

person having comparable training, skills and abilities," 29 C.F.R. § 1630.2(j)(3)(i), has

been significantly limited.  Further, at least one court has held, as relevant here, that flat

feet and the need to wear shoes with arch support devices does not render one

disabled for the purposes of the ADA.  *See Thomas v. Stephens*, 2005 WL 1335246, *

5 (E.D.Cal. May 24, 2005) (holding plaintiff's flat fees and diabetes did not render

plaintiff disabled despite his need to wear arch supports and take medication on a daily

basis to control diabetes as such conditions did not interfere with plaintiff's ability to

care for himself or perform any other major life activity).  Thus, Kaus's self-serving

assertions regarding the existence and the extent of his claimed physical problems are

insufficient on their face to create a material issue of fact requiring trial on this

prerequisite to Defendant's liability under the ADA.

As such, Kaus has failed to show that his physical impairments to his lower

extremities, particularly, his legs and feet, even without the benefit of mitigating

measures, including orthotic footwear, substantially limits Kaus's ability to perform any

major life activity, including walking or working, so as to qualify Kaus as an individual

with a disability under the ADA.  Kaus thus has failed to establish a *prima facie* case

under the ADA of disability requiring trial based on employment discrimination insofar

as Kaus alleges a failure to reasonably accommodate his disability (First Cause of

Action), harassment and discrimination (Second Cause of Action), and retaliation for

requesting accommodation of his disability (Fifth Cause of Action).  Accordingly,

Defendant's motion for summary judgment should be GRANTED as to the First,

Second and Fifth Causes of Action.

Although the undersigned is recommending granting summary judgment as to

Kaus's First, Second and Fifth Cause of Action on the basis that Kaus has failed to

establish a *prima facie* case of disability under the ADA, should the District Judge

disagree with such recommendation, the merits of Kaus's other claims are addressed in

the alternative.


### 2.    Plaintiff's *Prima Facie* Showing of Defendant's Failure to Accommodate

Kaus alleges that Defendant failed to provide a reasonable accommodation for

his disability, including transferring Kaus to another position that would have been less

physically stressful given Kaus's physical disabilities, or providing Kaus with chemical-

resistant work boots with orthopedic molds to ease the asserted strain on Kaus's knees

and feet.  Complaint ¶¶ 12-18.  Defendant maintains that even if Kaus were to establish

he has a disability as defined under the ADA, there is no evidence that Kaus ever

required a reasonable accommodation to perform the essential functions of his job, or

that Defendant ever denied a request by Kaus for any such accommodation.

Defendant's Memorandum at 14-17.  Kaus, on the other hand, maintains he requested

reasonable accommodations on at least five occasions between March and July 2002

but that Wysocki responded to such requests by referring to Kaus as a "trouble maker"

and a "big stone in his ass."  Plaintiff's Memorandum at 8-9.  Defendant nevertheless

argues in further support of summary judgment that the relevant EEOC regulations do

not require an employer to provide the orthopedic shoes Kaus requested and,

therefore, no trial on this issue is required as it is irrelevant to Defendant's alleged

liability.  Defendant's Reply Memorandum at 6 (citing 29 C.F.R. Part 1630 App., §

1630.9).

The ADA prohibits employers from discriminating against an "otherwise qualified"

individual on the basis of his disability.  42 U.S.C. § 12112.  An individual is "otherwise

qualified" under the statute if he can, "with or without reasonable accommodation, . . .

perform the essential functions of the employment that such individual holds or

desires."  42 U.S.C. §§ 12111(8) and 12112.  The Second Circuit has held that to make

out a *prima facie* case of employment discrimination under the failure to provide

reasonable accommodation of the ADA, the plaintiff must show "either that [he] can

perform the essential functions of the job without accommodation or that [he] can do so

with reasonable accommodation and that the employer refused to make such an

accommodation."  *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999).

The relevant regulation, to the extent it is due any deference, *Sutton*, *supra*, 527

U.S. at 480, provides in pertinent part that

The term reasonable accommodation means:

* * *

(ii)  Modifications or adjustments to the work environment, or to the manner or
circumstances under which the position held or desired is customarily performed,

that enable a qualified individual with a disability to perform the essential functions of that position; or
(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1)(i).

Further, "reasonable accommodations" may include "reassignment to a vacant position; acquisition or modifications of equipment or devices . . . ."  29 C.F.R. § 1630.2(o)(2)(ii).

With respect to Kaus's request for orthopedic workboots, Defendant argues that such footwear would qualify as a "personal item" which an employer is not required to provide.  Defendant's Reply Memorandum at 6-7.  In support of this argument, Defendant quotes the Appendix to 29 C.F.R. Part 1630, the Interpretive Guidance on Title I of the Americans with Disabilities Act, as follows:

This [reasonable accommodation] obligation does not extend to the provision of adjustments or modifications that are primarily for the personal benefit of the individual with a disability.  Thus, if an adjustment or modification is job-related, e.g., specifically assists the individual in performing the duties of a particular job, it will be considered a type of reasonable accommodation.  On the other hand, if an adjustment or modification assists the individual throughout his or her daily activities, on and off the job, it will be considered a personal item that the employer is not required to provide. . . .

29 C.F.R. Part 1630 App., § 1630.9.

According to Defendant, because "[s]pecial orthopedic shoes would clearly assist Kaus in all of his daily activities, they would not be specifically tailored to his particular job," and, as such, Defendant was not obligated under the ADA to provide Kaus with orthopedic shoes.  Defendant's Reply Memorandum at 6.

Defendant's argument, however, misses the point of the regulation.  Kaus did not request "orthopedic shoes;" rather, Kaus requested chemical resistant orthopedic

workboots similar to the chemical resistant workboots he was required to wear while

working in Defendant's Sanitation Department, but with orthodic foot molds to better

support his feet and knees.  Significantly, the Appendix to Part 1630 provides that

although

> an employer would generally not be required to provide an employee with a
> disability with a prosthetic limb, wheelchair, or eyeglasses, . . . . the provision of
> such items may be required as a reasonable accommodation where such items
> are specifically designed or required to meet job-related, rather than personal
> needs.

29 C.F.R. Pt. 1630 App., § 1630.9.

Defendant points to no evidence in the record suggesting that Kaus intended to use

such specially modified footwear anywhere other than at work.

Defendant also takes issue with the fact that Kaus does not dispute that

Defendant permitted Kaus to order new work boots, which Kaus was required to wear

for his job in the Sanitation Department, that Defendant was not obligated to eliminate

such requirement to accommodate Kaus, and that Kaus did not request another pair of

work boots upon determining the new boots were insufficient.  Defendant's Reply

Memorandum at 7.

Kaus argues in opposition to summary judgment that after he had consulted with

an orthopedic specialist in April 2002, who advised Kaus to purchase the special

orthopedic molded shoes for his feet, Kaus requested Defendant's assistance in

obtaining the proper footwear necessary to accommodate his physical problems at

work.  Plaintiff's Memorandum at 9.  Defendant, however, rather than helping Kaus

procure chemical resistant orthopedic work boots as Kaus had requested, merely

directed Kaus to select and order regular chemical resistant work boots from a

45

company catalog, and also required Kaus to pay for the boots, at a cost of $ 60, despite Kaus's insistence that he needed orthopedic work boots.  *Id*. at 8-9.  According to Kaus, chemical resistant orthopedic work boots were available through a source other than the company catalog, but cost $ 700.[24]  *Id*. at 9.  Kaus further maintains that he never requested another pair of work boots because he believed any such further request would be futile.  *Id*.

Although Defendant correctly asserts it was not obligated under the ADA to dispense with the requirement that Kaus wear chemically resistant work boots while performing his job in the Sanitation Department, Defendant does not challenge Kaus's assertion that he need chemical resistant orthopedic work boots.  Nor does Defendant argue that obligating Kaus to bear the $ 700 cost of such boots renders their proposal an unreasonable accommodation.

As to Kaus's requests to be transferred to another position in a department where he could perform light duty work, Kaus maintains that his transfer request was prompted by Defendant's refusal to accommodate his disability by providing Kaus with chemical resistant orthopedic work boots so as to enable Kaus to continue working in the Sanitation Department.  Plaintiff's Memorandum at 9-10.  Kaus further maintains that despite Defendant's "seniority and job posting/bidding system," Defendant has, on at least two occasions, either assigned or offered to transfer Kaus to another position, including assigning Kaus to the Sanitation B position in February 2000, and offering to transfer Kaus to a Trash Detail position in July 2002, *id*. at 10-11, suggesting that

---

[24] Kaus does not identify the source of the chemical resistance orthopedic work boots.

Defendant is not bound by the CBA's job posting and bidding rules to transfer an employee to another position.  Finally, Kaus asserts that Defendant filled 30 light duty positions for which Kaus would have been qualified had such positions been posted for bidding, including Quality Control and Checker positions, with temporary employees from an employment agency.  *Id*. at 12.  Defendant argues in further support of summary judgment that the light duty positions filled with temporary employees from an employment agency were not permanent positions which the ADA does not require an employer to convert into permanent positions in order to accommodate an impaired employee.  Defendant's Reply Memorandum at 7.[25]  As discussed below, however, despite the parties extensive arguments on this point, both parties overlook a more basic premise to establishing an employment discrimination claim under the failure to reasonably accommodate prong of the ADA, thereby negating the court's need to discuss these arguments.

In particular, Kaus does not allege, nor does any evidence in the record suggest, that he was unable to perform his job in the Sanitation Department <u>without</u> a reasonable accommodation.  Significantly,

> The term "otherwise qualified" is intended to make clear that the obligation to make reasonable accommodation is owed only to an individual with a disability who is qualified within the meaning of [29 C.F.R. Pt. 1630, App.] § 1630.2(m) in that he or she satisfies all the skill, experience, education and other job-related selection criteria.  An individual with a disability is "otherwise qualified," in other words, if he or she is qualified for a job, except that, because of the disability, he or she <u>needs a reasonable accommodation to be able to perform the job's essential functions.</u>

---

[25] Defendant does not argue that the filling of light duty positions with temporary employees from an employment agency was in compliance with the CBA, nor does Kaus challenge Defendant or the CBA on this ground.

29 C.F.R. Pt. 1630, App. § 1630.9 (underlining added).

That the relevant regulations, as well as applicable Second Circuit caselaw, articulates the need to provide a reasonable accommodation only to one who is "otherwise qualified" to perform the essential functions of the job, 20 C.F.R. Pt. 1630, App. § 1630.9; *Norville*, 196 F.3d, at 99, where an individual can perform the essential functions of the job without any accommodation, an employer cannot be found liable under the ADA for failing to provide a reasonable accommodation.  As nothing in this record shows Kaus was unable to work in Defendant's Sanitation Department despite his asserted physical difficulties, Defendant is not liable on this ground.  Indeed, nothing in the record indicates that Kaus did not continue to work in the department after his alleged accommodation requests were denied by Wysocki.  Moreover, where an employer fails to provide a reasonable accommodation and then takes an adverse employment action against the plaintiff, the plaintiff is nevertheless required to demonstrate a causal connection between the disability, or the lack of accommodation, and the adverse employment action.  *See Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100, 108 (2d Cir. 2001) (affirming jury's determination that no ADA violation occurred when an employer terminated an employee who, because of the absence of an accommodation, could not return to work as the reasons for termination were unrelated to the employee's inability to return to work without accommodation).

Accordingly, summary judgment should be GRANTED as to this aspect of Defendant's motion.

### 3.    Plaintiff's *Prima Facie* Case of Defendant's Retaliation

Kaus alleges that Defendant discriminated against him in violation of the ADA by retaliating against him for requesting a reasonable accommodation of his disability. Complaint ¶¶ 10.b - 10.d; 12-18.  Defendant maintains that Kaus cannot establish a *prima facie* case of retaliation because Kaus cannot establish that he engaged in a protected activity under the ADA.  Defendant's Memorandum at 21-22.  Defendant further maintains that Kaus is unable to establish any causal connection, required for a viable retaliation claim, between his requests to transfer to another position or to obtain orthopedic work boots and his termination for engaging in racially offensive behavior, which provided an intervening and legitimate reason for Kaus's termination.  *Id*. at 22-23.  Kaus argues in opposition to summary judgment that Defendant does not dispute that Kaus need not establish he was a qualified individual with a disability as defined under the ADA to assert a meritorious claim of disability-based retaliation, or that Kaus may prevail on a retaliation claim even though the underlying conduct complained of was not in fact unlawful so long as Kaus believed in good faith that it was unlawful. Plaintiff's Memorandum at 15-16.

The ADA prohibits against retaliation in relation to a disability claim by specifically providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  The elements of a retaliation claim under the ADA include:

"(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew

that plaintiff was engaged in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action."

*Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002).

Some courts have held that a non-disabled employee is nonetheless protected against retaliation for mistakenly requesting a reasonable accommodation provided the employee made a good faith request for a reasonable accommodation. *Conley v. United Parcel Service*, 88 F.Supp.2d 16, 20 (E.D.N.Y. 2000) (citing *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997)*; Butler v. City of Prairie Village*, 974 F.Supp. 1386, 1402 (D.Kan. 1997), *rev'd in part*, 172 F.3d 736 (10th Cir. 1999); and *Matthews v. American States Inc. Co.*, 1997 WL 752442 (D. Kan. 1997)).  Similarly, the Second Circuit has held that a non-disabled individual who files a complaint of disability discrimination is engaging in activity protected under the ADA "so long as he can establish that he possessed a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'"  *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)).  *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (same).

        As relevant to Kaus's retaliation claim, in each of the aforementioned ADA retaliation cases where the plaintiff was found to have had a good faith belief that the employer's underlying challenged actions violated the law, the plaintiff had suffered an adverse employment action *after* filing an administrative complaint regarding such underlying actions.  The crux of each of those holdings was that the action challenged in the administrative complaint did not constitute employment discrimination in violation

50

of the ADA because the plaintiff was unable to establish he was disabled within the meaning of the ADA; nevertheless, to avoid discouraging employees from filing, in good faith, claims with the EEOC alleging disability-based employment discrimination, the courts held that any retaliation by an employer against an employee who has filed such an administrative claim, can support a claim for retaliation under the ADA.

In contrast, in the instant case, Kaus did not file his administrative complaint with the EEOC until *after* the challenged adverse employment action by Defendant, *i.e.*, the termination of his employment.  As such, on its face, Kaus's filing of the EEOC complaint is not the ADA protected activity in which Kaus engaged that is the basis for Kaus's retaliation claim and, thus, whether Kaus's EEOC complaint was filed in good faith or not is irrelevant.  Rather, Kaus's claim of retaliatory discharge is based on his request that Defendant accommodate his disability by either assisting him financially in procuring chemical resistant orthopedic work boots or transferring him to a light duty position where such boots were not required.  Plaintiff's Memorandum at 14-17.  It is established law, however, that such requests for accommodation do not constitute protected activity in which Kaus participated in good faith because, as discussed, Discussion, *supra*, at 47-48, Kaus never alleged that he was unable to perform the essential functions of his job without the requested accommodations.  Unless the alleged accommodation request arises from a physical impairment that qualifies for protection under the ADA, an alleged retaliation against such accommodations is beyond the reach of the statute and it therefore not actionable.

Accordingly, Kaus's filing of the EEOC complaint and his requests for the work boots or a transfer to another position cannot support a claim for retaliation under the

ADA.  Kaus has thus failed to establish a *prima facie* case of retaliation under the ADA

on any ground, and summary judgment as to these claims should be GRANTED.

### 4.      Plaintiff's *Prima Facie* Case of Being Regarded as Disabled by Defendant

Kaus alternatively alleges that his employment was terminated based on

Defendant's perception that Kaus was disabled.  Complaint ¶¶ 29-31.  Defendant

argues in support of summary judgment that Kaus cannot succeed on this claim

because Kaus cannot show that Defendant wrongly perceived that Kaus has an

impairment that substantially limits a major life activity when, in fact, Kaus either has no

impairment, or if Kaus has an impairment, such impairment does not substantially limit

any major life activity.  Defendant's Memorandum at 12-13.  Specifically, according to

Defendant, Kaus, using "tortured logic," maintains that Defendant's failure to recognize

that Kaus's physical impairments cause Kaus to limp and, instead, interpreting Kaus's

impaired walk as a "racially offensive 'ghetto' walk" demonstrates that Defendant

regarded Kaus as disabled.  *Id*. at 13.  Kaus, while offering nothing in opposition to

summary judgment on this claim, nevertheless does not concede Defendant's

argument on this claim.

Kaus's failure to demonstrate that he has an impairment that substantially limits

a major life activity within the meaning of the ADA does not preclude Kaus from being

considered disabled under the ADA upon demonstrating that he was "regarded as

having such an impairment."  42 U.S.C. § 12102(2)(C); *see Francis v. Meriden*, 129

F.3d 281, 284 (2d Cir. 1997) (stating that an individual need not actually have a

physical impairment within the meaning of the ADA to state a claim under the "regarded as" prong of the ADA).  The relevant EEOC regulations provide:

> *Is regarded as having such an impairment* means:
> (1) Has a physical or mental impairment that does not substantially limit a major life activity, but it treated by a covered entity as constituting such limitation;
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
> (3) Has none of the impairments defined [by the EEOC regulations] but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l).

However, it is not enough for a plaintiff alleging employment discrimination under the "regarded as" prong of the ADA merely to show that the employer was aware of the plaintiff's impairment; rather, the plaintiff must demonstrate that the employer regarded the employee as disabled within the meaning of the ADA and that such "perception caused the adverse employment action."  *Reeves*, *supra*, 140 F.3d at 153 (quoting *Kelly*, *supra*, 94 F.3d at 109).  "In this context, whether the plaintiff is actually disabled under the ADA is irrelevant, it is the employer's perception that counts."  *Dietrich*, *supra*, 2004 WL 2202656 at *11 (citing *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 646 (2d Cir. 1998)).

The Second Circuit has considered circumstantial evidence and found a *prima facie* case of employment discrimination under the "regarded as" prong of the ADA based upon such evidence.  *See Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc.*, 198 F.3d 68 (2d Cir. 1999).  Specifically, in *Heyman*, the Second Circuit held that a reasonable trier of fact could conclude by a preponderance of the evidence that the defendant regarded the plaintiff, who suffered from lymphoma, a fact known to the employer, as having a physical

impairment that significantly restricted his ability to perform the major life activity of working, given that not long before the plaintiff's discharge, plaintiff's former manager had died from lymphoma, after missing a significant amount of work.  *Heyman*, *supra*, 198 F.3d at 73.  In the instant case, there is evidence in the record that Kaus suffers from several physical impairments that interfere, at least minimally, with his ability to walk, including that Kaus requested special chemical resistant work boots with molded orthotics or to be transferred to another position where Kaus would have less strain on his feet and knees, that Wysocki responded to such requests by referring to Kaus as "a big stone in his ass," and that within one month of Kaus's final request for such accommodations, Kaus was suspended and eventually terminated for telling a racially offensive conduct that mocked African-American employees in violation of Defendant's Anti-Harassment Policy.

Kaus, inexplicably, has neither pointed to such evidence nor argued in opposition to summary judgment that upon considering such evidence, a reasonable trier of fact could conclude that Defendant's termination, ostensibly for violating Defendant's Anti-Harassment Policy, was a mere pretext for the fact that Defendant regarded, based on Kaus's alleged "ghetto walk," Kaus as having a physical impairment that significantly restricted his ability to walk or to work.  Nor does Kaus specify any other basis for his belief that Defendant perceived him as having a disability that substantially limits a major life activity, as required to establish that Defendant regarded Kaus as disabled within the meaning of the ADA.  *See Shannon v. New York City Transit Authority*, 332 F.2d 95, 99 n. 1 (2d Cir. 2003) (citing *Colwell*, *supra*, 158 F.3d at 646 (stating that to make required showing "that the employer regarded the individual as disabled within

the meaning of the ADA," plaintiffs had to show that defendants regarded plaintiff as "having an impairment that substantially limited a major life activity.")).

Furthermore, Kaus does not dispute Defendant's characterization of Kaus's "regarded as" claim as self-defeating.  Defendant's Memorandum at 13.  Specifically, Defendant maintains that Kaus's assertion that Defendant's refusal to accept Kaus's explanation that what Thornton and Clyde referred to as a "ghetto" walk was actually a limp, related to Kaus's arthritis and flat feet, is patently inconsistent with Kaus's assertion that Defendant regarded Kaus as disabled.  *See id.*  *See also* Complaint ¶ 10.f; Plaintiff's Memorandum at 12-14.  Furthermore, Kaus's assertion that Defendant offered to transfer Kaus to the trash detail position, which required repeatedly pushing 200 to 300 pounds of trash off pallets into land-fill trucks, Complaint, ¶ 10.d, also fails to square with any perception by Defendant that Kaus was disabled.  Defendant's Memorandum at 13.

Significantly, Kaus's failure to counter Defendant's argument seeking summary judgment on this claim, particularly in light of the circumstantial evidence in the record, negates any possible good faith basis for Kaus's own belief in the claim's merits. Moreover, it is improper for the court to search the record to find evidence on which to construct an argument on this issue for Kaus, who is represented by counsel, as to do so would indicate the court has abandoned its neutral role in favor of advocating on behalf of Kaus.  *See Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.").  *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("[J]ust as a district court

is not required to scour the record looking for factual disputes, it is not required to scour

the party's various submissions to piece together appropriate arguments."). *See*

*Weinstock v. Wilk*, 2004 WL 367618, * 2 (D.Conn. Feb. 25, 2004) (denying defendant's

motion for reconsideration of decision denying summary judgment on one claim on

basis that defendant, in both memoranda of law submitted in support of summary

judgment and motion for reconsideration, merely stated, without explicitly arguing that

plaintiff's claim was unsupported by any factual allegations).   Thus, Defendant's

contention that there is no evidence to support Kaus's "regarded as" claim is

unopposed and summary judgment on this aspect of the motion therefore should be

GRANTED.


### 5.   Plaintiff's *Prima Facie* Case of Defendant's Harassment

Kaus also alleges that Defendant harassed him because of his disability.

Complaint ¶ 23.   Defendant maintains that Kaus failed to exhaust his administrative

remedies with regard to this claim and, as such, he cannot pursue it under the ADA in

this action.   Defendant's Memorandum at 17.   Defendant further asserts that because

in a deferral state such as New York, a plaintiff has only 300 days from the alleged act

of discrimination in which to file an administrative charge, Kaus is now time-barred from

asserting his harassment claim in the instant case.   *Id*. at 17-18.   Defendant also

asserts that the harassment claim is not "reasonably related" to any of the claims Kaus

included in his EEOC complaint and, as such, the EEOC was not put on notice of such

claim and therefore had no reasonable opportunity to investigate it.   *Id*. at 18.

Alternatively, Defendant maintains the claim is without merit because Kaus cannot

establish that he is a qualified individual with a disability under the ADA, and because if Kaus in fact believed that he was harassed based on his disability, Kaus was required to pursue a company provided remedy to such harassment through Defendant's Anti-Harassment Policy.  *Id.* at 20-21.  Kaus argues in opposition to summary judgment that his harassment claim arises from the same facts included in his EEOC charge regarding his claim that he was terminated in violation of the ADA.  Plaintiff's Memorandum at 16.  Kaus further maintains that because he is not alleging any new facts in support of his harassment claim in the instant action, as compared to the facts alleged in his EEOC charge, but, rather, is "simply alleging a new legal basis for liability – such claim is not precluded by failure to specifically include the term 'harassment' in his EEOC Charge."  *Id.* at 16-17.

A thorough reading of the administrative complaint Kaus filed with the EEOC reveals no allegation that Kaus was subjected to such harassment by Defendant based on Kaus's alleged disability.  *See* EEOC Complaint, Defendant's Exh. A.  Accordingly, the EEOC was not sufficiently notified of and was unable to investigate the asserted harassment claim.  Kaus's failure to exhaust administrative remedies as to the disability-based harassment claim prevent Kaus from bringing the claim in the instant action.  *Curto v. Edmundson*, 392 F.3d 502, 503 (2d Cir. 2004) (affirming district court's dismissal of ADA claims against defendant as plaintiff's failure to exhaust administrative, including EEOC, remedies before bringing suit precluded action against defendant under ADA).

Alternatively, a claim of harassment under the ADA is subject to the same analysis as harassment claims under Title VII.  *Hendler v. Intelecom USA, Inc.*, 963

F.Supp. 200, 208 (E.D.N.Y. 1997).  To establish a *prima facie* case of disability-based harassment, Kaus must establish that (1) he is a qualified individual with a disability; (2) he was subjected to unlawful harassment; (3) the harassment was based on his disability; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer, Defendant, knew or should have known of such harassment and failed to take prompt, remedial action.  *Id*. at 235-26.  Kaus's complaint, however, provides no factual basis supporting Kaus's harassment claim.  Rather, Defendant, as well as the court, is left to guess that Kaus's harassment claim "apparently arises out of the fact that Defendant believed, based on the statements of [Kaus's] African-American co-workers, that Mr. Kaus engaged in racially offensive behavior, which [Kaus] claims were caused by his limp.  Mr. Kaus claims that it constituted unlawful harassment for [Defendant] to believe his co-workers' allegations because it was actually his physical condition that caused him to walk in what his co-workers allegedly misperceived as a 'ghetto' walk."  Defendant's Memorandum at 19-20.  As discussed, Discussion, *supra*, at 52, because Kaus alleges that Defendant's disciplinary actions against him regarding Kaus's racially motivated walk in the presence of two black co-employees who complained to Defendant were a form of reverse discrimination, such motive cannot, rationally, at the same time support the conclusion that Defendant perceived that Kaus was disabled.  Kaus's manner of ambulation was, as a fact, either a "ghetto walk," of which Kaus was, based on his own allegation, wrongly accused by Defendant, or it was an innocent limp, but, logically, it cannot be both, and no reasonable juror could so

find.[26]

Accordingly, summary judgment should be GRANTED as to this claim as
Defendant requests.


B.    **Plaintiff's New York HRL Claims**

With respect to Kaus's claims brought pursuant to the HRL, including Kaus's

Third Cause of Action (alleging failure to accommodate his disability), Sixth Cause of

Action (alleging retaliation for requesting accommodation of his disability), and Seventh

Cause of Action (alleging Defendant regarded Kaus as disabled), the *McDonnell*

*Douglas* burden-shifting analysis applies to employment discrimination claim based on

disability whether brought pursuant to the ADA or to New York's HRL.  *Cruz, supra*, 202

F.3d at 565 n. 1.  In contrast to the ADA, however, the HRL does not require that the

employee demonstrate that a physical or mental impairment substantially impairs a

major life activity.  *Reeves*, 140 F.3d at 155.  Rather, "disability" is defined under New

York's HRL as

> (a) a physical, mental or medical impairment resulting from anatomical,
> physiological, genetic or neurological conditions which prevents the exercise of a
> normal bodily function or is demonstrable by medically accepted clinical or
> laboratory diagnostic techniques or (b) a record of such an impairment or (c) a
> condition regarded by others as such an impairment, provided, however, that in
> all provisions of this article dealing with employment, the term shall be limited to
> disabilities which, upon the provision of reasonable accommodations, do not
> prevent the complainant from performing in a reasonable manner the activities
> involved in the job or occupation sought or held.

---

[26] The court concedes it is theoretically possible that a truly disabled person with a peculiar form
of limp could conduct himself in a racially offensive manner, using the limp to disguise his racial prejudice,
but such a remote hypothetical is not among Kaus's arguments against summary judgment and,
therefore, should not preclude summary judgment on this issue.

N.Y. Exec. Law § 292.21.

For a physical impairment to qualify as a disability under New York's HRL, "the condition may manifest itself in one of two ways: (1) by preventing the exercise of a normal bodily function or (2) by being 'demonstrable by medically accepted clinical or laboratory diagnostic techniques.'" *Reeves*, *supra*, 140 F.3d at 155 (quoting N.Y. Exec. Law § 292.21).  As such, a "literal reading of the statute [N.Y. Exec. Law § 292.21], taking no account of the seemingly clear legislative purpose to enact a definition of disability coextensive with comparable federal statutes, treats a medically diagnosable impairment as . . . a disability for purposes of the [N.Y. HRL]." *Reeves*, *supra*, 140 F.3d at 155.  Although the term "disability" is therefore more broadly defined under New York's HRL as compared to the ADA, Kaus, oddly, has not pleaded a disability employment discrimination or harassment claim under New York's HRL.  As such, it is not necessary, for purposes of the instant summary judgment motion, to consider whether Kaus's claimed physical difficulties qualify as a disability for purposes of the New York's HRL, despite the court's determination that, even if they exist, they do not qualify for protection under the ADA.  Rather, Kaus claims disability employment discrimination under New York's HRL on the basis that Defendant failed to accommodate his disability (Third Cause of Action), retaliated against him for requesting a reasonable accommodation of his disability (Sixth Cause of Action), and regarded him as disabled (Seventh Cause of Action).

Assuming, *arguendo*, the District Judge agrees with the instant recommendation that summary judgment be granted in favor of Defendant on all of Kaus's federal disability-based employment discrimination claims under the ADA, the court could,

notwithstanding, exercise jurisdiction over Kaus's claims pursuant to New York's HRL

under 28 U.S.C. § 1367 which provides that "in any civil action of which the district

courts have original jurisdiction, the district courts shall have supplemental jurisdiction

over all other claims that are so related to claims in the action within such original

jurisdiction that they form part of the same case or controversy under Article III of the

United States Constitution." 28 U.S.C. § 1367 (a).  The court, however, may decline to

exercise supplemental jurisdiction over a state law claim where (1) the court has

dismissed all claims over which it has original jurisdiction, or (2) in exceptional

circumstances, there are other compelling reasons for declining jurisdiction.  28 U.S.C.

§ 1367(c)(2),(3).  The Second Circuit has stated that "'in the usual case in which all

federal-law claims are eliminated before trial, the balance of factors to be considered. . .

will point toward declining to exercise jurisdiction over the remaining state-law claims.'"

*Travelers Ins. Co. v. Keeling*, 996 F.2d 1485, 1490 (2d Cir.1993) (quoting

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *see also Warren v. Fischel*,

33 F.Supp.2d 171, 178 (E.D.N.Y. 1999).

Nevertheless, "the discretion implicit in the word 'may' in subdivision (c) of §

1367 permits the district court to weigh and balance several factors, including

considerations of judicial economy, convenience and fairness to litigants."  *Purgess v.*

*Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) (citing *Castellano v. Board of Trustees*, 937

F.2d 752, 758 (2d Cir. 1991)).  Where "dismissal of the federal claim occurs 'late in the

action, after there has been substantial expenditure in time, effort, and money in

preparing the dependent claims, knocking them down with a belated rejection of

supplemental jurisdiction may not be fair.  Nor is it by any means necessary.'" *Purgess*,

*supra*, 33 F.3d at 138 (quoting 28 U.S.C. § 1367, Practice Commentary (1993) at 835).

The Second Circuit has concluded that the district court abused its discretion by exercising supplemental jurisdiction over state law claims, despite the dismissal of all federal claims, "where the federal claims had been dismissed at a relatively <u>early</u> state and the remaining claims involved issues of state law that were unsettled." *Valencia v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003) (underlining added) (citing *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001); *see also Oliveira v. Frito-Lay, Inc.*, 251 F.3d 56, 64 (2d Cir. 2001); *Seabrook v. Jacobson*, 153 F.3d 70, 71-73 (2d Cir. 1998); and *Fay v. South Colonie Central School District*, 802 F.2d 21, 34 (2d Cir. 1986)). "Where a pendent state claim turns on novel or unresolved questions of state law, especially where those questions concern the state's interest in the administration of its government, principles of federalism and comity may dictate that these questions be left for decision by the state courts." *Morse v. Univ. of Vermont*, 973 F.2d 122, 127 (2d Cir. 1992) (holding that where state claims involved novel questions of state law, it was an abuse of discretion to exercise supplemental jurisdiction over state claims after dismissing federal claims, given that state had yet to decide applicable period of repose for actions brought under state statute).  The Second Circuit, on the other hand, has affirmed a district court's decision to retain state claims after dismissing all federal claims.  *See Purgess*, *supra*, 33 F.3d at 139 (holding district court did not abuse its discretion by exercising supplemental jurisdiction over state claims where four of five federal claims were dismissed on the eve of trial, final federal claim was dismissed after the close of all the evidence, the parties had spent years preparing for trial in federal court, jury had heard evidence for several days and was ready to being deliberations,

and it would have been wasteful to subject case to another full trial before a different

tribunal).

In the instant case, if the District Judge agrees with the recommendation that

summary judgment should be granted in Defendant's favor on all the federal claims,

such decision will serve as *res judicata* with regard to any future action on any

heretofore unpleaded state claims in state court.  Specifically, New York courts both

recognize and give full effect to the doctrine of *res judicata*.  *See Ryan v. New York

Telephone Co.*, 467 N.E.2d 487, 490 (N.Y. 1984) ("To be sure, it is a fundamental

principle that 'a judgment rendered jurisdictionally and unimpeached for fraud shall be

conclusive, as to the questions litigated and decided, upon the parties thereto and their

privies, whom the judgment, when used as evidence, relieves from the burden of

otherwise proving, and bars from disproving the facts therein determined.'") (quoting

*Fulton County Gas & Elec. Co. v. Hudson Riv. Tel. Co.*, 93 N.E. 1052, 1055-56 (N.Y.

1911)).  "Under the transactional approach to *res judicata* adopted by New York, 'once

a claim is brought to a final conclusion, all other claims arising out of the same

transaction . . . are barred, even if based upon different theories or seeking a different

remedy.'"  *Application of American Tobacco Co.*, 880 F.2d 1520-27 (2d Cir. 1989)

(quoting *O'Brien v. City of Syracuse*, 429 N.E.2d 1158, 1159 (N.Y. 1981)).  *See also

Troy v. Goord*, 752 N.Y.S.2d 460, 461 (App. Div. 4th Dep't 2002) ("[A] new claim

constitutes the same cause of action as the formerly litigated claim if they arise out of

the same transaction or occurrence or series of transactions or occurrences, even if the

new claim is based upon a different legal theory or seeks a different remedy.") (citing

*Smith v. Russell Sage College*, 429 N.E.2d 746, 749 (N.Y. 1981), *rearg. denied* 433

N.E.2d 537 (N.Y. 1982)).

As such, this court, in furtherance of judicial economy, should exercise supplemental jurisdiction over the state claims.  Furthermore, as discussed below, for the reasons that Kaus's disability-based employment discrimination claims are without merit, Kaus's parallel state claims, which are predicated on identified elements, are equally without merit.  *See Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 117 & n. 1 (2d Cir. 2004) (noting that as "New York State disability discrimination claims are governed by the same legal standard as federal ADA claims," the court's discussion of the plaintiff's failure to accommodate claim under the ADA "pertains equally to his [plaintiff's] parallel state claim.").

As stated, with the exception of whether a plaintiff is disabled within the meaning of the respective statutes, the same burden-shifting analysis applies to disability discrimination and retaliation claims under both the ADA and New York's HRL. Discussion, *supra*, at 57-58.  In *Giordano*, *supra*, 274 F.3d 740, the Second Circuit reversed as an abuse of discretion the district court's decision where, after dismissing on a motion for summary judgment all of the plaintiff's federal employment discrimination claims brought under the ADA claims on basis that plaintiff failed to establish he was disabled within meaning of ADA, the district court exercised its supplemental jurisdiction to retain state law claims alleging disability-based employment discrimination, and then dismissed the state claims on the basis that they were analyzed according to "the same analytical framework as the ADA."  *Giordano*, *supra*, 274 F.3d at 753-55.  Significantly, however, the plaintiff in *Giordano* had asserted an employment discrimination claim under New York's HRL which required a determination

as to whether the plaintiff's physical limitations rendered the plaintiff disabled within the meaning of New York's HRL.  *Id*.

In contrast, in the instant case, Kaus does not assert a claim of disability-based employment discrimination under the New York HRL, despite the state law's broader definition of disability and, importantly, none of the disability-based employment discrimination claims Kaus does assert under New York's HRL turn on whether Kaus's alleged physical impairments qualify him as "disabled" for purposes of the state statute. As such, consideration of Kaus's state claims does not involve a determination as to whether Kaus's physical impairments renders him disabled under the applicable New York law.  Nor does consideration of any of Kaus's state claims concern any "novel or unresolved questions of state law."  *Morse*, *supra*, 973 F.3d at 127.  Rather, the same determinations reached in connection with the recommendation to grant summary judgment on Kaus's ADA claims alleging failure to provide reasonable accommodations (First Cause of Action), Defendant regarded Kaus as disabled (Fourth Cause of Action), and retaliation (Fifth Cause of Action), would, under the doctrine of *res judicata*, require dismissal of Kaus's state law claims under New York's HRL in state court.  Specifically, Kaus has failed to establish a *prima facie* case under New York's HRL of discrimination based on Defendant's failure to accommodate his disability because the record is devoid of any evidence substantiating Kaus's claim that he needed any accommodation to perform his job so as to support a claim of failure to provide reasonable accommodations under New York's HRL.  Discussion, *supra*, at 47-48.  The record is similarly barren of any facts from which a reasonable trier of fact could find that Defendant regarded Kaus as disabled, in violation of the HRL, especially given Kaus's


failure to dispute Defendant's argument that Kaus's insistence that Defendant refused to accept Kaus's explanation that his "ghetto walk" of which Thornton and Clyde complained, was actually a limp, is inconsistent with Kaus's claim that Defendant regarded him as disabled.  Discussion, *supra*, at 54, 57-58.  Kaus's claim that Defendant regarded him as disabled is also inconsistent with Kaus's allegation that Defendant offered to transfer Kaus to a Trash Detail position with significant physical requirements, including the ability to repeated push 200 to 300 pounds loads of trash off pallets onto land-fill trucks.  Discussion, *supra*, at 55.   Nor is there any evidence in the record supporting Kaus's claim under the HRL that Defendant terminated Kaus's employment to retaliate against Kaus for engaging in protected activity, including requesting the asserted reasonable accommodation and filing an EEOC claim, as Kaus has failed to demonstrate any need for a reasonable accommodation, and Kaus's EEOC claim was filed *after* his termination.  Discussion, *supra*, at 50-51.

The court should, therefore, in the interest of judicial economy, exercise supplemental jurisdiction over the state claims and summary judgment as to such claims, for the reasons discussed, *supra*, should be GRANTED in favor of Defendant.

**5.      Defendant's Request for Attorney's Fees**

Defendant requests the court award the costs, including reasonable attorney's fees, incurred in connection with this action.  Defendant's Notice of Motion at 1. Defendant, however, provides nothing in support of such request, nor does Kaus respond in opposition to the request.  Nevertheless, as Defendant has specifically made the request, the court must address it.

"The ADA provides that a district court 'in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses and costs.'" *Parker*, *supra*, 260 F.3d at 111 (citing 42 U.S.C. § 12205).   An award of costs, including a reasonable attorney's fee is also provided for in employment discrimination cases brought pursuant to Title VII.   *Parker*, *supra*, 260 F.3d at 111 (citing 42 U.S.C. § 2000e-5(k)).   The same standard applies to a request for an award of attorney fees under the ADA as under Title VII.   *Id.* (citing cases).   In particular, "fees should be awarded to the prevailing *defendants* only when the plaintiff's 'claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.'" *Id.* (italics in original) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978)).   Further, a finding that a plaintiff brought or continued to litigate a claim in bad faith provides an even stronger ground for awarding attorneys fees to a prevailing defendant.   *Christiansburg Garment Co.*, *supra*, 434 U.S. at 422.[27]

As stated, in the instant case, Defendant provides nothing supporting an award of attorney fees.   Nevertheless, the ADA does not protect an employee from being fired because of an illness or disability as the "[ADA] is not a general protection of medically affected persons." *Christian v. St. Anthony Medical Center, Inc.*, 117 F.3d 1051, 1053 (7th Cir. 1997).   In light of the Supreme Court's holding in *Sutton*, *supra*, 527 U.S. at 467, decided on June 22, 1999, almost four years before the instant action was commenced on June 5, 2003, the determination as to whether an individual is disabled

---

[27] The court notes that New York's HRL does not similarly provide for an award of attorney's fees to the prevailing party.  *See* New York Exec. Law § 290 et seq.  *See also Obas v. Kiley*, 539 N.Y.S.2d 767, 769 (App. Div. 2d Dep't 1989) (observing that there is no authority for awarding attorney's fees to prevailing party in action brought pursuant to New York HRL).

for purposes of the ADA must be made "with reference to measures that mitigate the individual's impairment," *Sutton*, *supra*, 527 U.S. 467, Kaus and his attorneys should have known, upon reviewing Kaus's medical records prior to commencing this action, that the records unambiguously fail to support Kaus's assertion that Defendant discriminated against him because of a disability under the ADA.

In particular, Kaus and his attorneys should have known that (1) no medical evidence supports Kaus's assertion that he walks with a limp and needs an accommodation to perform his job, (2)  Kaus continued to work at his position in the Sanitation Department despite his inability to obtain chemical resistant orthotic footwear, and (3) in any event, Kaus's physical complaints could be readily ameliorated and, as such, no accommodation was necessary or actionable under the ADA.  That Kaus could not establish that he had a protected disability under the ADA thus should have been easily ascertained upon reviewing Kaus's medical records.  Significantly, Kaus's failure to plead a claim of disability under the New York HRL, under which the term "disability" is more broadly defined, reinforces the finding that this case was, from its inception, completely lacking in merit and frivolous.

Accordingly, Defendant's request for an award of costs and attorney's fees should be GRANTED.

## **CONCLUSION**

Based on the foregoing, Defendant's motion for summary judgment and attorney's fees (Doc. No. 12) should be GRANTED, and the matter remitted to the undersigned for further proceedings to determine the amount of costs and attorney's fees to be awarded.  If the District Judge does not agree costs and attorney's fees should be awarded, the Clerk of the Court should be directed to close the file.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:	August <u>30</u>, 2005
	Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      August 30, 2005
               Buffalo, New York